Louis M. Phillips (La. Bar No. 10505)
Peter A. Kopfinger (La. Bar No. 20904)
Ryan J. Richmond (La. Bar No. 30688)
**GORDON, ARATA, MCCOLLAM**
  **DUPLANTIS & EAGAN, L.L.P.**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: lphillips@gordonarata.com
Email: pkopfinger@gordonarata.com
Email: rrichmond@gordonarata.com

*Interim attorneys for the debtor-in-possession,*
*West Feliciana Acquisition, L.L.C.*

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. 10-10053 |
| WEST FELICIANA ACQUISITION, L.L.C., | CHAPTER 11 |
| DEBTOR. | JUDGE DOUGLAS D. DODD |

**MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (II) GRANTING PRIMING LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDER, (III) AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION, (IV) MODIYING AUTOMATIC STAY, (V) APPROVING NOTICE PROCEDURES**

**NOW INTO COURT**, through undersigned counsel, comes West Feliciana Acquisition, L.L.C. ("**WFA**"), debtor and debtor-in-possesion, which files this Motion for Interim and Final Orders (i) Authorizing Post-Petition Secured Financing, (ii) Granting Priming Liens and Superpriority Claims to Post-Petition Lender, (iii) Modifying Automatic Stay, (iv) Scheduling Final Hearing and (v) Approving Certain Notice Procedures (the "***Motion***"). In support, WFA represents:

**PRELIMINARY MATTERS**

1.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (K), (M), and (0). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.

On January 17, 2010 (the "Petition Date"), WFA filed a voluntary petition for relief (the "***Petition***") (Doc. # 1) under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***"). An official committee of unsecured creditors has yet to be appointed in this Chapter 11 case. Further, no trustee or examiner has been requested or appointed in this Chapter 11 case (the "Case"). WFA continues to manage and operate its business as debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

**INTRODUCTION**

3.

WFA's estate will suffer immediate and irreparable harm if WFA does not obtain immediate access to the proposed debtor-in-possession financing. WFA does not have unencumbered cash and needs liquidity to operate its business and pay operating expenses such as utilities and obligations to employees, vendors and service providers. As WFA's sole source of revenue, it is essential that the Mill remain open and operating allowing WFA to sell substantially all of WFA's assets as a going concern at a Section 363[1] sale, that it be insured and properly maintained, and that WFA continue to have unimpeded access to the good, services and

---

[1] WFA is filing a Motion with this Court seeking authority, under Section 363 of the Bankruptcy Code, to sell substantially all ofWFA's assets.

labor necessary for day-to-day operations.   Should the Mill shutdown for 2 week it will cost a minimum of $2-4 million to restart the Mill.  Should the Mill shutdown for 90 days it will cost a minimum of $10-20 million to restart the Mill.

4.

WFA believes that it would be futile, under the circumstances, to pursue alternative post-petition financing in the form of: (1) unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Code; (2) unsecured credit allowable under Sections 364(a) and 364(b) of the Code; or (3) secured credit pursuant to Section 364(c) of the Code, on more favorable terms and conditions from sources other than Amzak Capital Management, LLC ("*Amzak*").  Prior to the proposed financing requested herein WFA pursued numerous sources of financing that it will show to the Court at hearing, and it is only upon the terms and conditions requested herein that financing was obtained.   Accordingly, WFA is requesting authority to obtain post-petition financing from Amzak to fund WFA's continued operations in chapter 11, for the period and on the terms to be stated in a DIP Credit Agreement (the "*DIP Credit Agreement*")[2] and the proposed Interim Order attached hereto as Exhibit C (the "*Interim Order*"), with those loan obligations to be secured by the reasonable protections proposed in the Interim Order, including without limitation first-priority "priming" liens on all or substantially all of WFA's assets and super-priority administrative expense claims.

---

[2]    A draft of the DIP Credit Agreement will be provided to the Court on January 20, 2010.

# BACKGROUND

## 5.

WFA, doing business as Renew Paper (the "*Mill*"), operates a paper mill located in St. Francisville, Louisiana, approximately 28 miles north of Baton Rouge, Louisiana. WFA purchased the Mill from Tembec Inc. in April 2009. At the time of the acquisition of the Mill, the Mill was in cold shut down mode, meaning that the Mill's digesters, pulper and lines had been purged, the paper machines were not running and power was not being delivered to the Mill. The Mill manufactures kraft paper in various basis weights. The kraft paper is sold primarily to manufacturers of corrugated containers and paper bags. The current paper output is approximately 600 tons, with a target paper output of 875-925 tons. The Mill consists of a 455,000 sq. ft. of building on a 610 acre site and includes a pulp mill and 4 paper machines. The Mill is ideally located for both production and distribution. It is situated near I-10, the major East-West southern interstate, US 61, a major North-South Highway and a rail spur that is part of the Canadian National Railway System (formerly Illinois Central Railroad). This existing infrastructure provides excellent overland transportation to domestic and international customers as well as infrastructure to receive delivery of wood chips. The Mill is also located on the Mississippi River with river frontage providing future access to ship to the international markets. The Mill presently employs 197 people.

## 6.

In an effort by the Louisiana Department of Economic Development ("*LDED*") to incentivize WFA's investment in the Mill, LDED and WFA entered into that certain Cooperative Endeavor Agreement (the "*CEA*"), effective April 6, 2009, to facilitate the purchase, improvement and operation of the Mill. The public purpose served by the CEA was the creation

and maintenance of jobs and derivative economic benefits to the community and the State of Louisiana.

7.

Following WFA's acquisition of the Mill, WFA engaged Fluor Enterprises, Inc. ("*Fluor*") to perform necessary engineering services required to start-up the Mill and bring its paper machines into production. Fluor was also engaged to operate and maintain the Mill after it was brought into operation. The selection of Fluor, a wholly-owned subsidiary of a Fortune 100 company, to perform the start-up as a preliminary to operating the Mill appeared to be an excellent choice as Fluor represented it had the necessary skill set and expertise to perform. In reality, that choice resulted in a total disaster. In the very brief time Fluor was designated as the Mill's contract operator, its mismanagement of the Mill jeopardized the total investment of time, effort, and capital that has been expended by virtually all of the Mill's stakeholders in acquiring and commissioning the Mill, not least of which are the Mill's hardworking employees who depend on the Mill's operations for their livelihood. Fluor filed liens against the Mill seeking the payment of approximately $46,000,000.00 for work it allegedly performed on the Mill. Fluor's alleged lien amount is above the approximately $12.6 million WFA has already paid Fluor. Fluor failed to provide WFA with support WFA requested to substantiate and verify the start-up costs for which Fluor is seeking reimbursement. WFA vigorously disputes Fluor's liens and believes that Fluor owes WFA damages resulting from WFA's reliance on what turned out to be gross misrepresentations made by Fluor. Fluor's liens resulted in the Mill's equity investors declining to invest additional working capital to fund Mill operations, causing critical cash flow problems.

8.

In addition to the problems caused by Fluor, the recent record rainfall and cold temperatures also played a significant role in the Mill operations. The substantial rainfall resulted in loggers being unable to log and thus provide wood necessary for the operation of the Mill. The bitter cold temperatures caused a freeze in certain production components which resulted in a drop in paper production.

## WFA'S EXISTING DEBT STRUCTURE

9.

WFA acknowledges, with full reservation of all rights, claims, and challenges,[3] that prior to the commencement of the Case, LDED made a loan to WFA pursuant to the CEA. In connection therewith WFA believes that LDED will assert that WFA is indebted to LDED in the approximate amount of $2,071,954.63, secured by a first priority mortgage lien on WFA's immovable property and improvements thereon and other assets of WFA.

10.

WFA acknowledges, with full reservation of all rights, claims, and challenges,[4] that prior to the commencement of the Case, Tembec USA LLC ("*Tembec USA*") made a loan, advance or other credit accommodation to WFA. In connection therewith WFA believes that Tembec USA will assert that WFA is indebted to Tembec USA in the approximate amount of $5,193,987.54, and any obligations of WFA to Tembec USA are secured by a second or third priority mortgage lien on WFA's immovable property and improvements thereon and other assets of WFA.

---

[3]     WFA does not at this time, given the exigency of the filing, stipulate to the extent, validity, perfection, or priority of the liens and security interests purportedly securing any debt owed by WFA, except that asserted by Amzak. WFA reserves all rights and defenses with respect to such liens and security interests.

[4]     *See* footnote 3, *supra*.

11.

WFA acknowledges, with full reservation of all rights, claims, and challenges,[5] that prior to the commencement of the Case, Tembec Industries Inc. ("***Tembec Industries***") made a loan, advance or other credit accommodation to WFA. In connection therewith the WFA believes that Tembec Industries will assert that WFA is indebted to Tembec Industries in the approximate amount of $5,193,987.54, and any obligations of WFA to Tembec Industries are secured by a second or third priority mortgage lien on WFA's immovable property and improvements thereon and other assets of WFA.

12.

WFA acknowledges that prior to the commencement of the Case, Amzak made a loan, advance or other credit accommodation to WFA.  In connection therewith WFA stipulates and agrees, subject to the issuance of the DIP Orders (defined herein), that WFA is indebted to Amzak in the approximate amount of $13,012,059.84, together with interest.  WFA further stipulates and agrees that subject to the issuance of the DIP Orders, any obligations of WFA owed to Amzak are secured by a second priority mortgage lien on the WFA's immovable property and improvements thereon and a first priority security interest in and lien up on WFA's personal property, accounts receivable, cash and cash equivalent and other tangible and intangible property, other assets of WFA.

13.

As earlier stated, Fluor filed a lien against the Mill in the amount of $46,000,000.00. Once again, WFA vigorously disputes Fluor's lien and believes that Fluor owes WFA damages

---

[5]        *See* footnote 3, *supra*.

resulting from WFA's reliance on what WFA alleges were gross misrepresentations made by Fluor.

**BASIS FOR RELIEF**

14.

WFA brings this Motion on an expedited basis to avoid the immediate and irreparable harm that will be suffered by its estate if WFA does not obtain the liquidity needed to sustain its business as a going concern. WFA needs immediate access to both cash collateral and the proposed interim financing.

15.

Local Rule 4001(b) provides that the Court may grant interim relief when it is necessary to avoid immediate and irreparable harm to the estate. Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, this Court is empowered to conduct an interim expedited hearing on motion at which time it may authorize a debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001(b), WFA requests that the Court conduct an expedited Interim Hearing as soon after the Petition Date as the Court's schedule permits.

16.

WFA has determined, in consultation with its advisors, that it would not be able to obtain alternative financing on terms superior to the terms of the DIP Loan, and such terms are market terms that represent the best terms reasonably available to WFA.

# PROPOSED DIP FINANCING

## 17.

WFA is proposing to enter into the Credit Agreement with Amzak, pursuant to which WFA would be authorized to borrow up to a total of $6,000,000, $2,000,000 of which would be immediately available, with additional draws to be authorized in the sole discretion of Amzak up to the $6,000,000 maximum commitment, subject to the terms and conditions of the Budget (defined herein), the Loan Documents (defined below), the Interim Order and, as applicable, a Final Order, all to be secured by first position superpriority administrative expense claims and first priority priming liens on all property of WFA's estate.

# RELIEF REQUESTED

## 18.

By this Motion, WFA seeks entry of the Interim Order and a final order ("***Final Order***") and together with the Interim Order, collectively, the "***DIP Orders***") substantively in the form of the Interim Order and otherwise acceptable to Amzak, inter alia:

a)  authorizing WFA to obtain senior secured debtor-in-possession financing up to an aggregate principal amount of $4,000,000 (the "***DIP Loan***"); provided that following entry of the Final Order, Amzak's maximum commitment under the DIP Loan may be increased by $2,000,000 in the sole and absolute discretion of Amzak.  All interim and final borrowings shall be pursuant to a budget, attached hereto as Exhibit B, and approved by Amzak (as amended, modified or supplemented from time to time with Court approval, the Budget (defined herein)).

b) authorizing WFA to execute, enter into and perform all such documents, instruments and agreements (including, without limitation, the DIP Credit Agreement) (collectively, the "***Loan Documents***") as are required to implement the terms of the DIP Orders, and to perform such other and further acts as may be required in connection with the Loan Documents;

c) granting security interests, liens and superpriority claims (including a superpriority claim pursuant to section 364(c)(I) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) of the Bankruptcy Code, and priming liens pursuant to section 364(d)(1) of the Bankruptcy  Code) in favor of Amzak, to secure the obligations under the Loan Documents;

d) modifying the automatic stay imposed by section 362 of the Bankruptcy Code as required to permit (i) WFA and Lender to implement the terms of the DIP Orders, (ii) Amzak, modifying the automatic stay imposed by section 362 of the Bankruptcy Code as required to permit (i) WFA and Lender to implement the terms of the DIP Orders, (ii) Amzak, upon the occurrence and during the continuance of an Event of Default (defined herein), to exercise all rights and remedies in the Loan Documents, the Interim Order and, as applicable, the Final Order; and

e) scheduling a final hearing ("***Final Hearing***"), to be held no earlier than fifteen (15) days after entry of the Interim Order and no later than twenty-eight (28) days after the Petition Date, to consider entry of the Final Order; and

f) approving certain notice procedures for the hearings hereon.

## SUMMARY OF PRINCIPAL TERMS OF DIP FINANCING

19.

| | |
|---|---|
| Lender: | Amzak Management Capital Management, LLC |
| Maximum Loan Amount: | $6,000,000 ($2,000,000 initial advance and $2,000,000 at sole discretion of Amzak. After Final Order, up to an additional $2,000,000 at sole discretion of Amzak. |
| Interest Rate: | 15% per annum ("***Non-Default Rate***") |
| Default Interest Rate | Non-Default Rate plus 4% per annum. |
| Maturity Date: | The earliest of (i) the date that is sixty (60) days from the date of the Interim Order, or such later date to which Amzak may agree in writing; (ii) the effective date of a plan of reorganization concerning WFA; (iii) upon entry by the Bankruptcy Court of any order approving the WFA's sale of a material portion of its assets to an entity that is controlled by the Amzak or that is acceptable to Amzak in its sole discretion; (iv) the date on which an "***Event of Default***" occurs under the Loan Documents or (v) such time as there is a challenge filed with the Bankruptcy Court contesting the validity or ranking of Amzak's pre-petition mortgage. |
| Use of Proceeds: | Proceeds of the DIP Loan will be used for operating WFA's businesses and general corporate purposes, in accordance with a detailed, line item, 13 week budget approved by the Amzak (the "***Budget***"), as such Budget may be extended or modified with Amzak's prior written approval in its discretion. Budget extension or modification requests shall be sent to Amzak at least two (2) business days prior to the expiration of the existing Budget. WFA shall present at the end of each month a revised Budget for Amzak's written approval. The Budget shall set forth the post-petition operating expenses and other costs and expenses of administration of the Case. |
| DIP Loan Fee: | $50,000, payable on the date of the first advance. |

| | |
|---|---|
| Priority: | All amounts owing to Amzak under the DIP Loan at all times will constitute allowed super-priority administrative expense claims, pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 726 or 1114 of the Bankruptcy Code, subject only to the Carve-Out Expenses (as defined below) (the "*Superpriority Claim*"). |
| Security: | All amounts owing to Lender under the DIP Loan will be secured pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code by a first priority perfected security interest in and lien upon all property of the Debtor's estate (tangible, intangible, real, personal or mixed), whether now owned or hereafter acquired, including, without limitation, accounts, inventory, cash, cash collateral, equipment, capital stock in subsidiaries, membership interests in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, copyrights, trademarks, causes of action, including proceeds of avoidance actions, and other general intangibles, and all products, additions, accessions and proceeds thereof (as more particularly defined in the Credit Agreement, the "*Collateral*"), all subject only to the Carve-Out Expenses (collectively, the "*Liens*"). |
| Carve-Out: | The Liens and Superpriority Claim shall be subject only to the right of payment of the following expenses (the "*Carve-Out Expenses*"): <br> a. the UST Fees; <br> b. fees payable to the Clerk of the Bankruptcy Court; and <br> c. upon the occurrence of an Event of Default, the reasonable fees and expenses actually incurred from the Petition Date to the date of the Event of Default and approved by order of the Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "*Allowed Professional Fees*") by attorneys and |

accountants retained by WFA or any official committee of unsecured creditors appointed by the United States Trustee in the Case (collectively, the "***Professionals***"), but in the case of such Professionals only up to an amount equal to (A) the aggregate amount allocated in the Budget for such Professionals from the Petition Date to the date of the Event of Default, minus (B) payments made by the Debtor on account of the fees and expenses of such Professionals, and minus (C) the amount of any retainer held by or for such Professionals on the Petition Date (the "***Professional Fee Carve-Out***").

Excluded Professional Fees. None of (i) the Professional Fee Carve Out, (ii) any proceeds of the DIP Loan, or (iii) the Collateral, may be used to pay any Allowed Professional Fees or any other fees and/or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or Amzak's Pre-Petition Liens, (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Obligations or Amzak's Liens, or (iii) preventing Amzak' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral, (b) a request to use cash collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior written consent of Amzak, (c) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code other than from Amzak without the prior written consent of Amzak, other than financing the proceeds of which will be used to immediately satisfy in full all Obligations, (d) the commencement or

| | |
|---|---|
| | prosecution of any action or proceeding on any claims, causes of action, or defenses against Amzak or any of its members, officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, or (e) any act which has or could reasonably have the effect of resulting in the occurrence of an Event of Default under the DIP Credit Agreement, the Interim Order or the Final Order. |
| Events of Default: | In addition to the normal and customary events of default, the DIP Credit Agreement contains the following events of default:

(i)  dismissal of the Case or conversion of the Case to a Chapter 7 case;

(ii)  appointment of a Chapter 11 trustee or examiner or other person with expanded powers;

(iii)  The failure to pay any amount due under the DIP Loan;

(iv)  granting of relief from the automatic stay to permit (a) foreclosure on any assets of the Debtor;

(v)  (a) commencement of any action or contested matter to assert any claim or cause of action against Amzak; or (b) substantively consolidate the estate of WFA with any other entity.

(vi)  cessation of Liens or Super-Priority Claims granted with respect to the DIP Loan to be valid, perfected and enforceable in all respects;

(vii)  failure of the Bankruptcy Court to enter the Interim Order in a form acceptable Amzak and its counsel on or before the second business day following the Petition Date;

(viii)  failure of the Bankruptcy Court to enter the Final Order approving the DIP Loan in a form acceptable to Amzak and its counsel, |

| | |
|---|---|
| | within 28 days after the Petition Date;<br><br>(ix) failure by WFA to perform or comply in any material respect with any term, condition, covenant or obligation contained in the DIP Loan credit agreement, on its part to be performed or complied with where any such failure to perform or comply is not remedied within three (3) business days following written notice of the default; provided, however, that no notice of default or cure shall apply to any payment default or to any default that is the result of the entry of a court order;<br><br>(x) reversal, vacation or stay of the effectiveness of either the Interim Order or the Final Order;<br><br>(xi) unless otherwise consented to in writing by Amzak, failure of WFA to comply with the Budget within the variances set forth with the Credit Agreement, including without limitation, failure by WFA to comply with weekly production quotas contained therein. |
| Indemnification: | WFA shall indemnify and hold harmless Amzak and its members, and each of their Affiliates, respective officers, directors, members, partners, employees, authorized persons, agents, advisors, attorneys and representatives of each (each, an "***Indemnified Party***") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Loan, the DIP Loan documentation or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Loan, except to the extent such claim, damage, loss, liability or expense is found in a |

| | |
|---|---|
| | final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceedings to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by WFA, any of their directors, security holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. WFA further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to WFA or any of their security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |
| Challenge Period: | Parties-in-interest, including any official committee appointed in the Case shall have thirty (30) days from the date of entry of the Interim Order to file a challenge contesting the validity or ranking of Amzak's Pre-Petition Lien. |
| Other Terms: | Such other terms and conditions as typically found in DIP credit agreements. |

20.

Section 364 of the Bankruptcy Code authorizes this Court to allow WFA to obtain postpetition financing in the manner proposed. As security for all obligations owed under the DIP Loan, WFA proposes to grant to Amzak, subject to the Carve-Out, a superpriority claim and

perfected first-priority security interests and liens on all collateral securing the obligations under the Loan Documents to the extent it is property of WFA's estate.

## THE COURT SHOULD PERMIT THE DEBTOR'S USE OF CASH COLLATERAL

21.

Section 363(c)(2) of the Bankruptcy Code provides that debtors may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). "Cash collateral" is defined to mean "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

22.

As of the date of Petition Date, Amzak was the only secured creditor with a perfected security interest in WFA's Cash Collateral. Amzak consents to WFA's use of Cash Collateral.

23.

As adequate protection to Amzak for the use of Amzak's Cash Collateral, WFA grants unto Amzak, a valid, perfected replacement security interest in and lien the "Replacement Liens") on all of WFA's assets, subject and subordinate to (i) Liens granted to Amzak under the Interim Order or any Final Order, (iii) any existing liens or interests, and (iv) the Carve-Out.

24.

The Replacement Liens shall be deemed perfected automatically upon entry of the Interim Order, without the necessity of the filing of any UCC-l financing statement, state or federal notice, mortgage or similar instrument or document in any state or public record or office

and without the necessity of taking possession or "control" (within the meaning of the Uniform Commercial Code) of any Collateral.

25.

The Debtor submits that the foregoing protections to be granted.

26.

Section 364 of the Bankruptcy Code provides as follows:

(c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

    (1)    with priority over any and all administrative expenses of the kind specified in section 503(b) and 507(b) of this title;

    (2)    secured by a lien on property of the estate that is not otherwise subject to a lien;

    (3)    secured by a junior lien on property of the estate that is subject to a lien.

(d)    (1)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-

        (A)    the trustee is unable to obtain such credit otherwise; and

        (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

        11 U.S.C. § 364.

27.

Generally, sections 364(c) and (d) of the Bankruptcy Code require a debtor to demonstrate that alternative sources of post-petition credit are not available under sections 364(a) or (b). However, where few lenders are likely able or willing to extend the credit required, "it would be unrealistic and unnecessary to require WFA to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

28.

The universe of lenders who could commit to meet WFA's postpetition financing requirements is limited. Given WFA's financial condition and existing financing arrangements, WFA determined, in consultation with its advisors, that it would not be able to obtain unsecured credit or other financial accommodations allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. DIP financing is not otherwise available without WFA (i) granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b), of the Bankruptcy Code, other than in respect of the Carve-Out; and (ii) securing, pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, such obligations with security interests in and liens on all property of WFA's estate, now existing or hereafter acquired (*i.e.*, the Collateral).

29.

WFA has determined in consultation with its advisors that the terms of financing proposed by Amzak is the most favorable available under the circumstances. This is particularly true given: (i) reduced liquidity in the financial markets; (iii) the delay and cost attendant to soliciting proposals from new lenders, which would require additional due diligence and related

fees; (iv) that the operation of the Mill by WFA cannot survive through use of unencumbered property; and (v) WFA has sought financing from numerous other sources (even on like terms) to no avail.

30.

WFA negotiated the best financing arrangement that it can reasonably expect under the circumstances. The fees are customary and reasonable, and courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992). Moreover, the alternatives are dire; without additional liquidity WFA cannot continue operations and will be forced to dismiss the Case or convert to chapter 7, or in any event shut down the Mill, and cause its employers to be terminated which would create a chaotic and value destroying situation.

31.

Section 364(d) requires that a debtor provide adequate protection to the holder of a lien being primed by a debtor-in-possession lender. WFA maintains, and will present testimony at the Hearing, that the DIP Loan preserves the going concern value of WFA necessary to maximize WFA's sale value. Preserving the going concern value of the Mill making it an attractive sale prospect will afford the Mill with the best chance to survive which will help the community by maintaining employment[6] and also provide economic benefit to the State. WFA is a party to a significant supply contract with Duro Bag Manufacturing Company, the number one paper bag manufacturer in the world. The Duro Bag contract, along with other supply contracts, will ensure WFA with a ready market for its paper product during the period before the Section 363 sale.

---

[6]    The employees of the Mill, some of whom who have recently moved here with their families and purchased homes, have put in long hours to make the Mill succeed.

Without the DIP Loan, the Mill will shutdown and be sold at its liquidation value (in cold shutdown mode) or sold for scrap metal value. WFA maintains that the diminution in value that would be caused by a shutdown of the Mill would be greater than the DIP Loan.

32.

Based on the foregoing, WFA requests that the Court approve the DIP Loan in accordance with the terms in the DIP Orders.

## AMZAK IS ENTITLED TO THE "GOOD FAITH" PROTECTIONS OF SECTION 364(E) OF THE BANKRUPTCY CODE

33.

The terms and conditions of the DIP Credit Agreement are fair and reasonable. Such terms and conditions were negotiated in good faith and at arm's length at all times by WFA, Amzak and their respective advisors. WFA and Lender conducted good faith arms-length negotiations concerning the Budget and the terms of certain "first-day" pleadings that require the immediate use of cash collateral and access to interim financing from Amzak. WFA has agreed that it will not raise or assert actions on claims against Amzak, including claims and/or objections regarding Amzak's Pre-Petition claim or Pre-Petition lien rights. However, Amzak has agreed the Interim Order and Final Order can provide all parties other than WFA with the right to request that they be authorized by the Court to assert a behalf of the estate such actions ("**Amzak Action**") within 30 days after entry of the Interim Order.

34.

In light of the foregoing, Amzak should be accorded the benefits and protections of section 364(e) of the Bankruptcy Code with respect to the DIP Loan; specifically, any loans, advances or other financial accommodations that Amzak makes or causes to be made from time-

to-time to WFA on the terms and conditions set forth in the DIP Loan should be conclusively deemed to have been made and provided in "good faith" as the term is used in section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the DIP Orders or DIP Loan or any provisions are hereafter modified, vacated, amended or stayed by subsequent order of this Court or any other court without the express consent of Amzak.

## MODIFICATION OF AUTOMATIC STAY

### 35.

The DIP Loan and proposed DIP Orders contemplate a modification of the automatic stay to the extent applicable and necessary, to permit WFA and Amzak to implement the terms of the DIP Orders and, upon the occurrence and during the continuance of an Event of Default, to permit Amzak to exercise all rights and remedies in the Loan Documents and the Interim Order. Provisions of this kind are standard in debtor-in-possession financing and are reasonable under the circumstances.

## ESTABLISHING NOTICE PROCEDURES AND REQUEST FOR FINAL HEARING

### 36.

Pursuant to Bankruptcy Rule 4001(b)(2), the Court may commence a final hearing fifteen (15) days after service of this Motion. WFA shall, within three (3) business days of the entry of the Interim Order by the Court, serve by overnight mail, a copy of the Interim Order and a notice of the Final Hearing ("***Final Hearing Notice***") to consider entry of the Final Order on the date established by the Court. WFA requests that the Court require any party in interest objecting to

the relief sought at the Final Hearing to serve and file objections, which objections shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; and (iii) be filed with the Clerk of the United States Bankruptcy Court for the Middle District of Louisiana no later than seven (7) days before the Final Hearing and served upon counsel to WFA and counsel to Amzak so as to be received not less than seven (7) days before the Final Hearing.

37.

WFA requests that the Court schedule the Final Hearing and approve the proposed notice and objection procedures for the Final Hearing set forth herein.

**NOTICE AND PRIOR MOTIONS**

38.

WFA shall serve this Motion by overnight mail, hand delivery or facsimile on (i) Amzak; (ii) the United States Trustee, (iii) the holders of the twenty (20) largest unsecured claims against WFA's estate; (iv) known holders of asserted liens in property of WFA's estate, including the Louisiana Department of Economic Development, Amzak Capital Management LLC, Tembec USA LLC, Tembec Industries, Inc. and Fluor; (vii) the Internal Revenue Service; (viii) the Securities and Exchange Commission; (ix) known state and federal taxing authorities; (x) any known warehousemen and bailees in possession of property of WFA; and (xi) any party who has formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002.

39.

In light of the nature of the relief requested herein, WFA submits that no other and further notice of the Motion is necessary or required.

40.

No previous request for the relief sought has been made to this or any other court.

WHEREFORE, the Debtor requests that the Court (i) enter the Interim Order, (ii) schedule the Final Hearing and, at the Final Hearing, enter the Final Order, and (iii) grant the Debtor such just, legal, general or equitable relief as it deems may be just and proper under the circumstances.

January 21, 2010.                    By: **/s/ Louis M. Phillips**
                                         Louis M. Phillips (La. Bar No. 10505)
                                         Peter A. Kopfinger (La. Bar No. 20904)
                                         Ryan J. Richmond (La. Bar No. 30688)

                                     **GORDON, ARATA, MCCOLLAM,**
                                         **DUPLANTIS & EAGAN, L.L.P.**
                                     One American Place
                                     301 Main Street, Suite 1600
                                     Baton Rouge, LA 70801-1916
                                     Telephone: (225) 381-9643
                                     Facsimile: (225) 336-9763
                                     Email: lphillips@gordonarata.com
                                     Email: pkopfinger@gordonarata.com
                                     Email: rrichmond@gordonarata.com

                                     *Interim attorneys for the debtor-in-possession,*
                                     *West Feliciana Acquisition, L.L.C.*