

April 5, 2010

West Feliciana Acquisition, LLC
2105 LA Highway 964
St. Francisville, Louisiana 70775
Attn.: Mr. Allen Byrd

> **Re: Amzak Capital Management, LLC ("Amzak")**
> **Bid for the Purchase of Assets of**
> **West Feliciana Acquisition, LLC ("WFA")**

Dear Allen:

Please let the terms outlined in this letter and its attachments serve as the bid (the "**Amzak Bid**") by Amzak to acquire the Assets (as defined below) of WFA (the "**Acquisition**") pursuant to the Bidding and Sale Procedures approved by the Bankruptcy Court for the Middle District of Louisiana (the "**Bankruptcy Court**") on March 5, 2010, in connection with the chapter 11 case styled *In re West Feliciana Acquisition, LLC*, case no. 10-10053 (the "**Bidding and Sale Procedures**"). Any capitalized terms not defined herein shall have the meanings ascribed to them in the Bidding and Sale Procedures. In support of the Amzak Bid, attached please find the following:

1. A clean copy of Amzak's proposed Purchase and Sale Agreement for the Assets, together with a marked copy showing the changes made to the Debtor's proposed Purchase and Sale Agreement;

2. Resolution of Amzak regarding the Amzak Bid; and

3. A letter from JP Morgan regarding financial resources for the Amzak Bid.

It is Amzak's intent to be a Qualified Bidder. Amzak is bidding a minimum of $5,133,658.42 for the Assets of WFA and is prepared to remain a bidder through the end of the Auction. The $5,133,658.42 initial bid is described in detail on Schedule 2.4 of the Purchase and Sale Agreement and generally is comprised of the sum of: (i) the obligations payable to Amzak by Debtor pursuant to the Amended and Restated Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement (the "**DIP Credit Agreement**") and the Final DIP Financing Order, (ii) the Carve Out Expenses described at paragraph 12 of the Final DIP Financing Order; and (iii) scheduled and estimated ad valorem taxes due with respect to the Assets



AMZAK Capital
Management

If Amzak is selected as the Winning Bidder and our final bid exceeds $5,133,658.42 Amzak stands ready to submit a Letter of Credit (the "**LOC**") in accordance with the Bidding and Sale Procedures. A form of the LOC been circulated among the Notice Parties. As a Credit Bidder, Amzak is not required to submit a deposit.

Upon completion of the Sale Transaction, we intend to continue and expand the WFA operations at the current facility. We intend to keep all current WFA employees and are looking to grow the total number of employees to approximately 150-200 as production increases.

The Amzak Bid is irrevocable until three days following the Closing and is not conditioned on, or subject to, (i) the outcome of unperformed due diligence by Amzak and/or (ii) obtaining financing.

We are prepared to assume a number of the executory contracts and leases of WFA and pay the necessary cure amounts of such contracts. Schedule 2.1(c) of the clean Purchase and Sale Agreement enclosed herewith includes the list of executory contracts and unexpired leases that we will assume upon Acquisition. As assurance for our future performance of those executory contracts and leases, we attach a letter from JP Morgan demonstrating Amzak's ability to meet these financial obligations. For those remaining executory contracts and leases that will not be assumed, we propose to establish new relationships with those key vendors.

As part of the Amzak Bid, we represent that we:

(a) have had an opportunity to conduct any and all required due diligence regarding the assets being purchased pursuant to the Acquisition (the "**Assets**") prior to making our offer;

(b) have relied solely upon our own independent review, investigation and/or inspection of any documents and/or the Assets in making our bid;

(c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the Purchase and Sale Agreement; and

(d) are not entitled to any expense reimbursement or break-up fee or any other kind or type of fee or expense from WFA, in connection with our bid or the Acquisition.

Amzak submits to the core jurisdiction of the Bankruptcy Court and will waive the right to a jury trial, to the extent such right exists. Amzak understands that the Assets are being sold as one single transaction and that bids will not be accepted for only a portion of the Assets.


**AMZAK** Capital
Management

Scot Fischer will be representing Amzak at the Auction and, pursuant to the attached resolution, he is duly authorized to bid on behalf of Amzak at the Auction. Mr. Fischer also is the contact person for the Amzak Bid. He can be reached via email at sfischer@amzak.com, or via telephone at (954) 323-0624 (office) or (305) 215-8206 (cell). In the alternative, you may contact the following attorneys for Amzak: (i) Barbra Parlin, who can be reached via email at barbra.parlin@hklaw.com or via telephone at (212) 513-3210 (office) or (917) 658-5490) (cell); and (ii) Tom Skallas, who can be reached via email at tom.skallas@hklaw.com or via telephone at (312) 578-6630 (office) and (312) 371-5143 (cell).

Should you have any questions, please do not hesitate to contact Mr. Fischer or our attorneys.

Sincerely,

Michael D. Kazma

# 9305083_v4

# PURCHASE AND SALE AGREEMENT

by and between

**West Feliciana Acquisition, LLC, in its
capacity as Debtor and Debtor-in-Possession
as Seller**

and

**Amzak Capital Management, LLC**
As Buyer

April 5, 2010

# Purchase and Sale Agreement

This Purchase and Sale Agreement (this "Agreement") is dated and effective on ―――――――――――――――,April 5, 2010 by and between West Feliciana Acquisition, LLC, a Delaware limited liability company, in its capacity as Debtor and Debtor-in-Possession ("Seller"), and ―――――――――――――, a ―――――――――― corporation/Amzak Capital Management, LLC, a Nevada limited liability company ("Buyer").

## Preliminary Statements

A.      Seller was engaged in the business of operating a paper mill located in St. Francisville, Louisiana (the "Mill");

B.      Seller commenced a case, bearing Case No. 10-10053 (the "Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on January 17, 2010 by filing a voluntary petition with the United States Bankruptcy Court for the Middle District of Louisiana (the "Bankruptcy Court");

C.      Seller was authorized to sell substantially all the assets associated with the operation of the Mill (the "Business") pursuant to the Bankruptcy Courts' Order dated and entered on March 5, 2010; and

D.      Seller wishes to sell to Buyer and Buyer wishes to purchase from Seller substantially all the assets associated with the operation of the Mill and to assume from Seller the Assumed Liabilities (as defined in Section 2.7), pursuant to, inter alia Sections 363 and 365 of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure.

## Agreement

In consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    Defined Terms. As used herein, the terms below shall have the following respective meanings:"Affiliate" shall mean all parties falling within the definition of affiliate under either (i) Rule 12b-2 of the General Rules and Regulations of the Securities Exchange Act of 1934, as amended, or (ii) Section 101(2) of the Bankruptcy Code.

"Approval Order" means that certain Order to be entered by the Bankruptcy Court in connection with its approval of the sale of the Purchased Assets as discussed in section 7.1(b).

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"Environmental Liabilities" means any debts, adverse claims, liabilities, commitments, responsibilities, and obligations which may arise from or relate to any violation of or non-compliance with Environmental Laws.

"GAAP" shall mean United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" shall mean any (i) federal, state, local, municipal, foreign or other government; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (iii) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Intellectual Property Rights" shall mean patents, patent applications, inventions, know-how, technology, trade secrets, trademarks, trademark registrations, trademark applications, trade-names, copyrights, copyright applications, copyright registrations and any and all other intellectual property rights.

"Law" shall mean any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, principle of common law, judgment enacted, promulgated, issued, enforced or entered by any Governmental Entity, or other requirement or rule of law.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, Environmental Liabilities, and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records.

"Licensed Intellectual Property Rights" means all Intellectual Property Rights, other than Trademarks, owned by a third party and licensed or sublicensed to Seller and related to the operation of the Business in the Ordinary Course of Business.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust or other encumbrance.

"Material Adverse Effect" shall mean any development which could be reasonably expected to delay or prevent the consummation of the transactions contemplated hereby or which could be reasonably expected to materially and adversely affect the value of the Purchased Assets (as defined herein), taken as a whole.

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation or award of any Governmental Entity or private arbitration tribunal.

"Ordinary Course of Business" means the ordinary course of the Business during the period the Mill was actively operated from July 15, 2009 until February 5, 2010.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"Proceeding" shall mean any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity or arbitrator.

"Representative" shall mean, with respect to any Person, such Person's officers, directors, employees, agents and representatives (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

"Sale Hearing" shall mean the hearing to be scheduled and conducted by the Bankruptcy Court to consider approval and entry of the Approval Order.

"Sale Motion" shall mean the motion or motions of Seller seeking approval of the sale procedures and entry of the Approval Order.

"Tax" or "Taxes" shall mean any federal, state, county, local, foreign and other income, profits, gains, net worth, sales and use, ad valorem, gross receipts, business and occupation, license, estimated, stamp, custom duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employees, income withholding, social security, unemployment or other tax, together with any penalty, addition or interest with respect thereto.

"Tax Code" shall mean the Internal Revenue Code of 1986, as amended.

"Tax Return" shall mean any return, report, declaration or information return or statement relating to Taxes.

1.2. <u>Other Defined Terms</u>. The following additional terms shall have the meanings defined for such terms in the Sections set forth below:

| Term | Section |
|------|---------|
| Agreement | Preamble |
| Assigned Executory Agreements | 2.1(c) |
| Assumed Liabilities | 2.7 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Books and Records | 2.1(g) |
| Business | Recitals |
| Buyer | Recitals |
| Case | Recitals |
| Closing | 3.1(a) |
| Closing Date | 3.1(a) |
| Competing Transaction | 6.6 |

| Term | Section |
|------|---------|
| Cure Amounts | 2.7(c) |
| Equipment | 2.1(b) |
| Excluded Equipment | 2.1(b) |
| Excluded Executory Agreements | 2.2(h) |
| Excluded Liabilities | 2.8 |
| Immovable Property | 2.1(a) |
| Insurance Policies | 2.1(j) |
| Leased Property | 2.3 |
| Permits | 2.1(f) |
| Purchase Price | 2.4 |
| Purchased Assets | 2.1 |
| Purchased Trademarks | 2.1(e) |
| Seller | Recitals |

1.3.    Other Definitional Provisions The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b) The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

ARTICLE II
AGREEMENT TO PURCHASE AND SELL AND CONSIDERATION

2.1.    Sale and Purchase   Subject to Section 2.2, Section 2.3, the other provisions of this Agreement and the Approval Order, at Closing, Seller agrees to sell, convey, assign, transfer and deliver to Buyer, and Buyer agrees to purchase, acquire, and accept, without any warranty whatsoever,  all right, title and interest of Seller in and to the assets used by Seller exclusively in the conduct of the Business immediately prior to shutdown of the Business, but excluding the Excluded Assets and the Leased Property (collectively, the "Purchased Assets"), as specified below:the immovable property set forth in Schedule 2.1(a), together with all buildings and improvements located thereon (the "Immovable Property");

(b)    all machinery, equipment, auxiliary equipment, vehicles, fixtures attached to or associated with the equipment or machinery, machine parts, shop tools and equipment, spare parts, supplies, office equipment, furniture, furnishings, office supplies and other tangible personal property located on the Immovable Property as of ————————————the Closing (the "Equipment"), except as provided in Section 2.2(b).Schedule 2.1(b) (the "Excluded Equipment");

(c)    subject to assumption and assignment, the contracts, and leases listed on Schedule 2.1(c) (the "Assigned Executory Agreements"), except as provided in Section 2.2 (h);

(d)     to the extent assignable or transferable and subject to approval by the applicable licensor, all Licensed Intellectual Property Rights used or held for use in the Business, including but not limited to those Licensed Intellectual Property Rights listed on Schedule 2.1(d);

(e)     all Trademarks listed on Schedule 2.1(e) (the "Purchased Trademarks");

(f)     to the extent assignable or transferable, all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental Entity used or held for use in the Business in the Ordinary Course of Business, including but not limited to those licenses, permits and governmental authorizations listed on Schedule 2.01-2.1(f) (the "Permits");

(g)     all books, records, files and papers, whether in hard copy or computer format relating to the Purchased Assets, including, without limitation, engineering information, sales and promotional literature, manuals and data, sales and purchase correspondence, and lists of former suppliers, but excluding the books and records described in Section 2.2 (such included items, the "Books and Records");

(h)     to the extent assignable or transferable, any warranties and/or indemnification rights of Seller related to the Purchase Assets;

(i)     all other assets and properties of Seller or its Affiliates used or held for use in connection with the Business except as otherwise provided in Section 2.2; and

(j)     at the sole option of Buyer and to the extent assignable, all insurance policies listed on Schedule 2.1(j), subject to the agreement and/or approval of the respective insurance companies and/or their underwriters, as applicable (the "Insurance Policies").

2.2.    Excluded Assets.  Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer expressly understands and agrees that the following assets and properties of Seller (the "Excluded Assets") shall be excluded from the Purchased Assets:

(a)     all cash and cash equivalents on hand and in banks, and all cash equivalents and marketable securities, accounts receivable, if any, in each case, as of the close of business on the Business Day immediately preceding the Closing;

(b)     all rights to any cancellation value of any insurance policies as of the Closing, except the Insurance Policies described in Section 2.1(j);

(c)     all rights of Seller under this Agreement or any other Transaction Agreement;

(d)     the Tax and Tax related records such as invoices (excluding ad valorem Taxes related to the Real Estate and Equipment), minute books, stock transfer books and corporate seal of Seller;

(e)     the rights and claims to Tax refunds related to the Business or the Purchased Assets, relating to taxable periods ending on or prior to the Closing, regardless of whether the refunds or credits are realized following the Closing;

(f)     all assets (including books and records) related to any pension, profit sharing, stock bonus, stock option, thrift or other retirement plan, medical, hospitalization, dental, life, disability, vacation or other insurance or benefit plan, employee stock ownership plan, deferred compensation, stock ownership, stock purchase, bonus, benefit or other incentive plan, severance plan or other similar plan covering or applicable to Seller or its employees, whether or not sponsored by Seller and including plans sponsored by Seller's Affiliates;

(g)     all of Seller's claims and causes of action under Chapter 5 of Chapter 11 of Title 11 of United States Code (the "Bankruptcy Code") including, without limitation, under Sections 502, 510, 541, 542, 544, 545, 547-551, 553, and 558 of the Bankruptcy Code, and any other avoidance action under the Bankruptcy Code and all proceeds therefrom; and

(h)     the contracts and leases listed on Schedule 2.2(h) (the "Excluded Executory Agreements").

2.3.     Leased Property.  The property listed on Schedule 2.3 is property subject to unexpired leases and will not be conveyed to Buyer.

2.4.     Purchase Price~~2.5.~~~~_____~~.  {In consideration for purchasing the Purchased Assets and subject to the terms and conditions of this Agreement, Buyer will assume the Assumed Liabilities as provided in Section ~~2.7~~2.6 and at the Closing will pay ~~to Seller the full lump sum payment of _____.  The Purchase Price includes a credit bid consisting of _____.~~not less than $5,133,658.42 consisting partly of cash and partly a credit bid as more fully described in Schedule 2.4.

~~2.6.     Deposit.    [Buyer  has  given  a  deposit  in  the  amount  of  $50,000  to _____.  The  deposit  shall  not  be  considered  earnest  money  as  defined  in Louisiana  Civil  Code  article  2624.    If  the  transaction  contemplated  by  this  Agreement  is consummated  in  accordance  with  this  Agreement,  then  the  Deposit  will  be  applied  against  the Purchase  Price  at  Closing.    The  balance  of  the  Purchase  Price  after  application  of  the  Deposit will  be  paid  to  Seller  at  the  Closing.    Return  or  forfeiture  of  the  Deposit  shall  be  in  accordance with  the  Bidding  and  Sale  Procedures  attached  hereto  and  made  a  part  hereof  as  Exhibit  A  or Section  12.14  of  this  Agreement.]~~   Deposit.  Buyer is a Credit Bidder and is not required to provide a deposit.

~~2.6.~~~~2.7.~~     Liabilities to be Assumed by Buyer.    Upon the transfer of the Purchased Assets on the Closing Date, Buyer shall assume, pay and/or perform when due and discharge the following Liabilities (collectively, the "Assumed Liabilities"):Any and all Liabilities associated with, or in any way relating to, the Purchased Assets that arise after the Closing;

(b)     Any and all ad valorem taxes outstanding as of the Closing Date; and

(c)     The cure amounts (or a lesser amount) listed on Schedule 2.7(c) ("Cure Amounts") associated with the Executory Agreements.

~~2.7.2.8.~~     Excluded Liabilities.  Except as otherwise set forth in this Agreement, Buyer shall not assume, and shall be deemed not to have assumed, any Liabilities except for the Assumed Liabilities (collectively, the "Excluded Liabilities")~~, except that any Liabilities associated with the Purchased Assets to which Buyer, as owner of the Purchased Assets, would be subject by operation of law, notwithstanding the Approval Order, shall not be Excluded Liabilities~~.

## ARTICLE III
## CLOSING

3.1.     Closing; Transfer of Possession; Certain Deliveries.Unless this Agreement is terminated and the transaction contemplated herein is abandoned pursuant to Article VIII hereof, the closing of the transaction contemplated herein (the "Closing") will take place ~~on April        , 2010 or~~within the period required under the Bidding and Sales Procedures attached hereto as Exhibit A on such~~other~~ date as the parties hereto shall mutually agree, such date to be as soon as practicable following entry of the Approval Order.  The Closing shall be held at the offices of ———————————————Gordon Arata McCollam Duplantis & Egan LLP, at 10:00 a.m., local time, unless the parties hereto otherwise agree.  The actual time and date of the Closing are herein called the "Closing Date."

(b)     At the Closing, Seller shall deliver to Buyer:

(i)     A duly executed Act of Sale substantially in the form attached hereto as Exhibit B;

(ii)     A duly executed Bill of Sale substantially in the form attached hereto as Exhibit C;

(iii)     Documentation reasonably required by Buyer's counsel showing that Seller has the authority to enter into this Agreement, to execute the Closing documents contemplated herein and to convey title to the Purchased Assets;

(iv)     Seller's affidavit setting forth its Taxpayer Identification Number, office address, and a statement that it is not a "foreign person" as defined in Internal Revenue Code §1445, as amended;

(v)     A copy of the Approval Order;

(vi)     The officer's certificates required to be delivered pursuant to Section 7.2(c) hereof; and

(vii)     All other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be reasonably necessary to convey the Purchased Assets to Buyer or Buyer's designee.

(c)    At the Closing, Buyer shall deliver to Seller:

    (i)    The Purchase Price less any deposits and less the debt amounts and other credit payments set forth on Schedule 2.4 (such debt to be discharged up to the amount of the Purchase Price at Closing in consideration for the Purchased Assets) to be paid by wire transfer to an account or accounts designated by Seller;

    (ii)    Documentation such as a company resolution or written consent, reasonably required by Seller's counsel showing that Buyer has the authority to enter into this Agreement, to execute the Closing documents contemplated herein and to accept title to the Purchased Assets and assume the Assumed Liabilities; and

    (iii)    The officer's certificate required to be delivered pursuant to Section 7.3(c) hereof.

(d)    Seller and Buyer hereby acknowledge that Internal Revenue Code Section 6045 requires the entity closing a real estate transaction to report the terms of the transaction to the Internal Revenue Service. Seller and Buyer agree that they will ~~request~~ _____ ~~be the~~agree on a closer of the transaction for purposes of compliance with Section 6045 of the Code. Seller and Buyer hereby ~~agrees~~agree to execute and deliver to _____ ~~such closer~~ at Closing any certificates or other documentation required ~~by~~ _____ in order to comply with these requirements.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

4.1.    Existence; Good Standing and Power. Seller is a limited liability company validly existing and in good standing under the laws of Delaware. Subject to entry of the Approval Order, Seller has all requisite power and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by Seller and to perform its obligations hereunder and thereunder.

4.2.    Authority. The execution, delivery and performance of this Agreement and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all necessary company action on the part of Seller.

4.3.    Execution and Binding Effect. This Agreement has been duly and validly executed and delivered by Seller, and, following entry of the Approval Order, this Agreement and the transaction contemplated hereby constitute (assuming in each case the due and valid authorization, execution and delivery thereof by the other parties hereto), a valid and legally binding obligation of Seller enforceable against Seller in accordance with its respective terms.

4.4.    No Violation. The execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby, do not and will not conflict with or result in, with or without the giving of notice or lapse of time or both, any violation of or constitute a breach or default, or give rise to any right of acceleration, payment, amendment, cancellation or

termination, under (a) the certificate of formation, limited liability company operating agreement of Seller or any resolution or written consent adopted by the board of managers or the members of Seller and not rescinded, (b) subject to entry of the Approval Order, any agreement or other instrument to which Seller is a party or by which Seller or any of the Purchased Assets is bound, (c) subject to entry of the Approval Order, any Order of any Governmental Entity to which Seller is bound or subject, (d) subject to entry of the Approval Order, any Law applicable to Seller or any of its respective properties or assets or (e) except as provided for herein, result in the imposition or creation of any Lien upon or with respect to any of the Purchased Assets.

4.5.  <u>Brokers and Finders</u>.  Seller has employed Poyry Forest Industry Consulting, Inc. ("<u>Poyry</u>") in connection with the transactions contemplated by this Agreement. All payments due to Poyry are the sole responsibility of Seller and will be made in accordance with the Retention Agreement between Seller and Poyry dated January 29, 2010 and the Bankruptcy Court's Order dated February 26, 2010 approving the retention of Poyry.

4.6.  <u>Limitations on Seller's Representations and Warranties</u>.  Except for the representations and warranties contained in this Agreement, Seller makes no other express or implied representation or warranty, including, without limitation, representations or warranties as to the condition of the Purchased Assets, their contents, the income derived or potentially to be derived from the Purchased Assets, or the expenses incurred or potentially to be incurred in connection with the Purchased Assets.  Seller is not, and will not be, liable or bound in any manner by express or implied warranties, guarantees, statements, promises, representations or information pertaining to the Purchased Assets or the Business, made or furnished by any broker, agent, employee, servant or other person representing or purporting to represent Seller, unless and to the extent the same is expressly set forth in this Agreement.

4.7.  <u>Condition of Property and Waivers.</u>  THE SALE OF THE PURCHASED ASSETS IS MADE AND ACCEPTED ON AN "AS IS" AND "WHERE IS" BASIS WITH ALL FAULTS OR DEFECTS, WHETHER LATENT OR APPARENT, KNOWN OR UNKNOWN AND WITH NO LEGAL WARRANTIES WHATSOEVER ALL OF WHICH ARE EXPRESSLY WAIVED. BUYER, FOR ITSELF AND ON BEHALF OF ITS ASSIGNS AND TRANSFEREES, ACCEPTS THE PURCHASED ASSETS IN THE CONDITION AS EXISTING AT THE TIME OF SALE. SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING TITLE OR OWNERSHIP TO THE PURCHASED ASSETS, THE ABSENCE OF LIENS OR ENCUMBRANCES, THE CONDITION OF THE PURCHASED ASSETS, OR ANY PARTS THEREOF, INCLUDING, WITHOUT IMITATION, THE SOIL CONDITION, THE FITNESS OF THE PURCHASED ASSETS FOR ANY PURPOSE OR INTENDED USE, THE PRESENCE OR ABSENCE OF APPARENT OR HIDDEN DEFECTS, THE PRESENCE OR ABSENCE OF ENVIRONMENTAL CONTAMINATION, OR THE COMPLIANCE OF THE PURCHASED ASSETS WITH ANY APPLICABLE LAWS, RULES OR REGULATIONS, ALL OF WHICH WARRANTIES ARE HEREBY EXPRESSLY WAIVED BY BUYER. BUYER FULLY AND COMPLETELY WAIVES ANY AND ALL RIGHTS FOR THE RETURN OF ALL OR ANY PART OF THE PURCHASE PRICE BY THE REASON OF ANY SUCH DEFECTS. BUYER ACKNOWLEDGES AND DECLARES THAT NEITHER SELLER NOR ANY PARTY, WHOMSOEVER, ACTING OR PURPORTING TO ACT IN ANY CAPACITY WHATSOEVER ON BEHALF OF SELLER, HAS MADE ANY DIRECT, INDIRECT,

EXPLICIT OR IMPLICIT STATEMENT, REPRESENTATION OR DECLARATION, WHETHER BY WRITTEN OR ORAL STATEMENT OR OTHERWISE, AND UPON WHICH BUYER HAS RELIED, CONCERNING TITLE TO THE PURCHASED ASSETS, THE ABSENCE OF ANY LIENS OR ENCUMBRANCES, THE EXISTENCE OR NON-EXISTENCE OF ANY QUALITY, CHARACTERISTIC OR CONDITION OF THE PURCHASED ASSETS, EXCEPT AS CONTAINED IN THIS AGREEMENT. BUYER EXPRESSLY WAIVES ALL LEGAL WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTY OF OWNERSHIP, WARRANTY OF PEACEFUL POSSESSION, WARRANTY OF TITLE, WARRANTY AGAINST EVICTION, WARRANTY OF ABSENCE OF LIENS AND ENCUMBRANCES, THE WARRANTY OF FITNESS AND THE WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS, WHETHER APPARENT OR LATENT, IMPOSED BY LOUISIANA CIVIL CODE ARTICLES 2475, 2500 AND 2520, ANY OTHER APPLICABLE STATE OR FEDERAL LAW, AND THE JURISPRUDENCE THEREUNDER. BUYER ALSO WAIVES ANY RIGHTS IT MAY HAVE IN REDHIBITION OR TO A REDUCTION OF PURCHASE PRICE PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520 THROUGH 2548, INCLUSIVE, IN CONNECTION WITH THE PURCHASED ASSETS. BY ITS SIGNATURE, BUYER EXPRESSLY ACKNOWLEDGES ALL SUCH WAIVERS AND ITS EXERCISE OF BUYER'S RIGHT TO WAIVE WARRANTY PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2503 AND 2548. BUYER AGREES THAT BUYER HAS CONDUCTED ITS OWN EVALUATION AND INSPECTION AND HAS MADE ITS OWN DETERMINATION AS TO ANY CONDITION OF THE PURCHASED ASSETS, ANY DEFECTS THEREIN, AND THE SUITABILITY AND FITNESS OF THE PURCHASED ASSETS FOR BUYER'S INTENDED USE(S).

4.8.   Additional Environmental Waivers.   BUYER, FOR ITSELF AND ITS ASSIGNS AND TRANSFEREES HEREBY ACCEPTS THE PURCHASED ASSETS IN THE EXISTING ENVIRONMENTAL CONDITION AND WAIVES, DISCHARGES, AND RELEASES SELLER, ITS AFFILIATES, ASSIGNS, AGENTS, REPRESENTATIVES, SHAREHOLDERS, OFFICERS, EMPLOYEES, DIRECTORS AND INSURERS FROM ANY AND ALL CLAIMS AND/OR CAUSES OF ACTION WHICH BUYER OR ITS ASSIGNS OR TRANSFEREES MAY HAVE OR HEREAFTER BE OTHERWISE ENTITLED TO, WHETHER AFFECTING PERSON AND/OR PROPERTY, FOR ANY ENVIRONMENTAL LIABILITIES ARISING FROM THE PURCHASED ASSETS, INCLUDING ANY CLAIMS, DEMANDS, CAUSES OF ACTIONS (BOTH PUBLIC AND PRIVATE), JUDGMENTS, ATTORNEYS' FEES, COSTS, EXPENSES, PENALTIES AND FINES, IMPOSED OR ASSESSED UNDER ANY AND ALL FEDERAL, STATE OR LOCAL ENVIRONMENTAL LAW, RULE, REGULATION, RULING OR ORDINANCE, OR THE LIKE, INVOLVING THE ENVIRONMENT INCLUDING, BUT NOT LIMITED TO, ARTICLE 2315.3 OF THE LOUISIANA CIVIL CODE, THE LOUISIANA ABANDONED OILFIELD WASTE STATE LAW (La. R.S. 30:71 *et seq.*), THE LOUISIANA ENVIRONMENTAL QUALITY ACT (La. R.S. 30:2001 *et seq.*), THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT, (42 U.S.C. §9601 *et seq.*), THE RESOURCE CONSERVATION AND RECOVERY ACT (42 U.S.C. §6901 *et seq.*), THE SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT OF 1986, AND THE TOXIC SUBSTANCE CONTROL ACT (15 U.S.C. §2601 *et seq.*), AS ALL OF THE ABOVE MAY BE AMENDED FROM TIME TO TIME (COLLECTIVELY, "ENVIRONMENTAL LAWS").

4.9.  Acknowledgment.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER IS HEREBY TRANSFERRING ITS RIGHT, TITLE AND INTEREST IN AND TO THE PURCHASED ASSETS "AS IS," "WHERE IS" AND "WITH ALL FAULTS" AND WITHOUT ANY WARRANTY OR RECOURSE WHATSOEVER, NOT EVEN AS TO THE RETURN OF ALL OR ANY PART OF THE PURCHASE PRICE, AND WITH THE SOLE PERIL AND RISK OF EVICTION BEING ASSUMED BY BUYER, BUT WITH FULL SUBSTITUTION AND SUBROGATION IN AND TO ALL OF THE RIGHTS AND ACTIONS OF WARRANTY WHICH SELLER HAS OR MAY HAVE AGAINST ALL PRECEDING OWNERS OR VENDORS.

4.10.  Act of Sale; Bill of Sale.  The waivers of warranty shall be effective as of and contained in the Act of Sale and the Bill of Sale.

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1.  Existence, Good Standing and Power.  Buyer is a ———————limited liability company validly existing and in good standing under the laws of the State of ———————Nevada.  Buyer has all requisite power and authority to conduct its business as presently conducted, to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and to perform its obligations hereunder and thereunder.

5.2.  Authority.  The execution, delivery and performance of this Agreement and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Buyer.  Execution and Binding Effect.  This Agreement has been duly and validly executed and delivered by Buyer and, following entry of the Approval Order, this Agreement and the transaction contemplated hereby constitutes (assuming, in each case, the due and valid authorization, execution and delivery thereof by the other parties hereto) a valid and legally binding obligation of Buyer, enforceable against it in accordance with its terms.

5.4.  No Violation.  The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby, do not and will not conflict with or result in, with or without the giving of notice or lapse of time or both, any violation of or constitute a breach or default, or give rise to any right of acceleration, payment, amendment, cancellation or termination, under (a) the [list of organizational documents] Articles of Organization of Buyer or any resolution or written consent adopted by [———————]the manager of Buyer and not rescinded, (b) any agreement or other instrument to which Buyer is a party or by which Buyer or any of its respective properties or assets is bound, (c) any Order of any Governmental Entity to which Buyer is bound or subject or (d) any Law applicable to Buyer or any of its respective properties or assets.  Third Party ApprovalsApproval.  The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons which have

not been obtained by Buyer, other than the approval of the Bankruptcy Court pursuant to the Approval Order.

5.6. <u>Brokers and Finders</u>. Buyer has not employed any broker or finder or incurred any liability for any brokerage fees, commissions, finders, or similar fees in connection with the transactions contemplated by this Agreement. <u>No Continuation of Business</u>. Buyer's business is neither a continuation of, nor is it related to, the business of Seller, and Buyer covenants and agrees that it will not, in any way, represent that its business is a continuation of or related to the business of Seller. <u>Financing</u> Buyer acknowledges and agrees that the purchase of the Purchased Assets is not subject to any financing contingency whatsoever and that on the Closing Date, Buyer will have sufficient funds on hand or committed lines of credit to consummate the transactions contemplated by this Agreement.

## COVENANTS OF THE PARTIES

6.1. <u>Preservation of Purchased Assets</u>. From and after the date hereof and until the Closing Date, except as may be contemplated or permitted by this Agreement, Seller will use commercially reasonable efforts in the context of the Case to maintain the condition of the Purchased Assets. Seller agrees that it: (i) will maintain all existing security measures that currently protect such Purchased Assets or the Property; and (ii) will continue to take such actions and maintain all conditions as are required to ensure that the Purchased Assets remain in the conditions existing on the date hereof on the Closing Date, subject to normal wear and tear. <u>Access.</u> Buyer acknowledges and agrees that the purchase of the Purchased Assets is not subject to any additional due diligence and that Buyer has conducted all tests and investigations and other due diligence that is deems necessary and appropriate to purchase the Purchased Assets. Buyer has not permitted any lien to be filed against the Purchased Assets arising out of Buyer's investigation, inspections or tests. Buyer shall indemnify, defend and hold Seller harmless from and against any and all claims, charges, actions, costs, suits, damages, injuries, liens, or other liabilities which arise, either directly or indirectly, from Buyer's or its contractors, agents or representatives inspection of the Purchased Assets. The provisions of this Section 6.2 setting forth Buyer's obligations, including the indemnification, defense and hold harmless provisions herein, shall survive the Closing or any termination of this Agreement. In connection with all such investigation, inspections or testing, Buyer represents that it has not caused or permitted any alteration or damage to any portion of the Purchased Assets and has promptly restored the Purchased Assets to the condition prior, if any alteration or damage results. <u>Reasonable Efforts.</u> Upon the terms and subject to the conditions herein provided, each of the parties hereto shall use its respective reasonable, good faith efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable under applicable Laws and regulations to ensure that the conditions set forth in this Agreement are satisfied and to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the parties hereto shall furnish to each other such necessary information and reasonable assistance, as each may request in connection with Seller's preparation and filing of applications and motion papers, including the Sale Motion needed to obtain Bankruptcy Court approval of the transactions contemplated by this Agreement and shall execute any additional instruments necessary to consummate the transactions contemplated hereby, whether before or after the Closing.

6.4.    Notification of Certain Matters.   Seller shall give prompt notice to Buyer, and Buyer shall give prompt notice to Seller, of (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby or the entry of the Approval Order; and (iii) any damage to the Purchased Assets that occurs after the execution of this Agreement that would reasonably be expected to have a Material Adverse Effect on the total value of all of the Purchased Assets.    Further Assurances.  On and after the Closing Date, the parties shall take all appropriate action and shall execute all documents, instruments or conveyances of any kind that may be reasonably necessary or advisable to carry out any of the provisions hereof.  Competing Transaction.  From the date hereof (and any prior time) and until the Bid Deadline (as set forth in the Bidding and Sale Procedures), Seller is permitted to cause its Representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and Representatives) in connection with any sale or other disposition of the Purchased Assets (a "Competing Transaction").  In addition, Seller may have the responsibility and obligation under the Bankruptcy Code or other applicable law to respond to any inquiries or offers to purchase the Purchased Assets and perform any and all other acts related thereto, including, without limitation, supplying information relating to the Business and Purchased Assets to prospective buyers.

CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1.    Conditions Precedent to Obligations of Buyer and Seller.  The respective obligations of Buyer, on the one hand, and Seller, on the other hand, to close the transactions contemplated under this Agreement shall be subject to the satisfaction (or waiver by the other party) at or prior to the Closing Date of the following conditions:No Injunction.  No preliminary or permanent injunction or other order issued by, and no Proceeding or Order by or before any Governmental Entity in the United States or by any United States Governmental Entity nor any Law or Order promulgated or enacted by any United States Governmental Entity shall be in effect or pending which materially delays, restrains, enjoins or otherwise prohibits or seeks to restrain, enjoin or otherwise prohibit the transaction contemplated hereby.

(b)    Bankruptcy Court Authorization.  The Bankruptcy Court shall have entered the Approval Order.  The "Approval Order" shall be an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby, and shall be in a form reasonably acceptable to Buyer.

(c)    Consents and Approvals.  All consents, waivers, authorizations and approvals of third Persons as are necessary in connection with the transactions contemplated by this Agreement shall have been obtained, except for such consents, waivers, authorizations and approvals which would not have a Material Adverse Effect and such consents and approvals which are not required due to the entry by the Bankruptcy Court of the Approval Order.

7.2.    Conditions Precedent to Obligations of Buyer.  The obligation of Buyer to close the transactions contemplated under this Agreement is subject to the reasonable satisfaction (or waiver by Buyer) at or prior to the Closing Date of each of the following additional

conditions:Accuracy of Representations and Warranties.  The representations and warranties of Seller contained herein shall be true and correct in all material respects on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such date.

(b)    Performance of Agreements.  Seller shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them prior to or at the Closing Date.

(c)    Officer's Certificate.  Buyer shall have received a certificate, dated as of the Closing Date, of an officer of Seller to the effect that the conditions specified in Sections 7.2(a) and (b) above have been fulfilled.

7.3.    Conditions Precedent to the Obligations of Seller.  The obligation of Seller to close the transactions contemplated under this Agreement is subject to the satisfaction (or waiver by Seller) at or prior to the Closing Date of each of the following additional conditions:Accuracy of Representations and Warranties.  The representations and warranties of Buyer contained herein shall be true and correct in all material respects on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representations or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such date.

(b)    Performance of Agreements.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or at the Closing Date.

(c)    Officer's Certificate.  Seller shall have received a certificate, dated as of the Closing Date, ~~from~~of an officer of Buyer to the effect that the conditions specified in Sections 7.3(a) and 7.3(b) above have been fulfilled.

ARTICLE VIII
TERMINATION

8.1.    Termination of Agreement.  This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:By mutual written consent of Buyer and Seller;

(b)    By either Buyer or Seller if the Closing shall not have occurred on or before ————————,April 30, 2010; provided, however, that, if the Closing has not occurred due to the failure of the Bankruptcy Court to enter the Approval Order or due to the existence of an unresolved objection to the Sale Motion and if all other conditions to the respective obligations of the parties to close hereunder that are capable of being fulfilled by ——————————,April 30, 2010 have been so fulfilled or waived, then neither party may terminate this Agreement prior to ————————,May 31, 2010; provided, further, however, that if the Closing has not occurred on

or before any such date due to a breach of this Agreement by Buyer or Seller, the breaching party may not terminate this Agreement pursuant to this Section 8.1(b);

(c)     By either Buyer or Seller, provided such party is not in breach of this Agreement, if there shall be any Law or regulation that makes the consummation of the transactions contemplated hereby illegal or otherwise prohibited or if consummation of the transactions contemplated hereby would violate any non-appealable final order, decree or judgment of any court or governmental body having competent jurisdiction;

(d)     By either Buyer or Seller if Seller consummates a Competing Transaction, on the Business Day following the date of consummation of any Competing Transaction (unless Seller or Buyer shall previously have given notice of termination pursuant to this Section 8.1); or

(e)     By Seller, on the one hand, or Buyer, on the other, if Buyer or Seller, as the case may be, materially breach any of its obligations under this Agreement, unless such breach shall be cured within ten (10) Business Days after such other party shall have received written notice of such breach in accordance with the terms hereof;

(f)     By Buyer if, between the date of execution of this Agreement and the Closing Date, a material portion of the Purchased Assets are destroyed or damaged such that a Material Adverse Effect would result. Seller agrees that it shall provide prompt written notice in the event that any portion of the Purchased Assets are destroyed or damaged, Buyer and Seller also may agree to consummate the transaction contemplated hereby with respect to non-damaged Purchased Assets, upon the parties' agreement to a concomitant reduction in the Purchase Price.

8.2.     No Liabilities in Event of Termination.  In the event of any termination of the Agreement pursuant to Section 8.1, written notice thereof shall forthwith be given to the other party specifying the provision hereof pursuant to which such termination is made, this Agreement shall forthwith become wholly void and of no further force and effect, and there shall be no liability on the part of Buyer or Seller, except that the obligations of Seller and Buyer under Sections 6.2 and 12.1 shall remain in full force and effect and except that if this Agreement shall be terminated pursuant to Section 8.1(e) hereof, the breaching party shall remain liable to the non-breaching party for costs, expenses and damages incurred by its breach.

ARTICLE IX
MINERAL RIGHTS

9.1.     Mineral Rights.  If Seller owns any mineral rights they will be conveyed without any warranties whatsoever in the same manner as the Purchased Assets are being conveyed.

ARTICLE X
POSSESSION

10.1.     Possession.  Possession of the Purchased Assets will be delivered to Buyer at the Closing.

## ARTICLE XI
## RISK OF LOSS

11.1. <u>Risk of Loss.</u> Until the Closing, risk of loss to the Purchased Assets, ordinary wear and tear excepted, shall be upon Seller. Immediately after the Closing, risk of loss to the Purchased Assets shall be solely upon Buyer.

## ARTICLE XII
## MISCELLANEOUS

12.1. <u>Expenses.</u> Except as set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each party shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the transactions contemplated hereby.

12.2. <u>Assignment.</u> Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Seller; provided, however, that Buyer may assign its rights and obligations hereunder, in whole or in part, to a nominee of Buyer, provided that no such assignment will relieve Buyer of its liabilities and obligations hereunder if such assignee does not perform such obligations and provided further, that this Agreement may be assigned to one or more trustees appointed by the Bankruptcy Court to succeed to the rights of Seller.

12.3. <u>Parties in Interest.</u> This Agreement is binding upon and inures solely to the benefit of Seller and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of Seller or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of Seller or Buyer, nor any director, officer, employee, representative, agent or other controlling person of each of the parties hereto and their respective Affiliates will have any liability or obligation arising under this Agreement or the transactions contemplated thereby.

12.4. <u>Notices.</u> Any and all notices or deliveries required to be given to another party to this Agreement shall be in writing and shall be delivered (i) in person, (ii) by a nationally recognized overnight carrier that guarantees next day delivery and provides a receipt, (iii) United States first class certified mail, return receipt requested, or (iv) by legible facsimile with receipt confirmed (immediately followed by a hard copy in accordance with the preceding subparts (i), (iii) or (iii), and such notices shall be addressed to the addresses provided below. Any notice, request, demand or communication required or permitted to be delivered hereunder shall be deemed delivered when received. Rejection or other refusal to accept, or inability to deliver because of change of address of which proper notice was not given under this Agreement to the other party, shall be deemed to be receipt of the notice, request, demand or communication. Either party may change its address for notice from time to time by delivery of at least ten (10) calendar days prior written notice of such change to the other party hereto in the manner prescribed herein. If executed and delivered via facsimile, each party shall, immediately

upon execution of this Agreement, send the other party a facsimile copy of a signed signature page (followed by a hard copy of the original signature page):

If to Seller:

West Feliciana Acquisition, LLC
2105 LA Highway 964
St. Francisville, Louisiana 70775
Attention: Allen F. Byrd
Fax: 225-336-2894

With a duplicate copy (which shall not constitute notice to Seller) to:

Gordon Arata McCollam Duplantis & Eagan LLP
One American Place
301 Main Street
Baton Rouge, Louisiana 70801-1916
Attention: Louis M. Phillips, Esq.
Fax: 225-336-9763

If to Buyer:

_____
_____
_____
_____
Attention: _____
Fax: _____

Amzak Capital Management, LLC
1 N. Federal Highway
Boca Raton, FL 33432
Attention: Michael D. Kazma
Fax: (561) 338-7677

With a duplicate copy (which shall not constitute notice to Buyer) to:

_____
_____
_____
_____
Attention: _____
Fax: _____

Holland & Knight LLP
131 S. Dearborn St., 30th Floor
Chicago, IL 60603
Attention: Michael J. Zdeb
Fax: (312) 893-5298

12.5.   Choice of Law.  This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the Bankruptcy Code and the substantive laws of the State of Louisiana, in each case without regard to the conflict of law principles thereof or of any other jurisdiction.

12.6.   Entire Agreement:—; Amendments and Waivers.   This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties.  Except as set forth herein or in any certificate delivered pursuant hereto, no party (or any employee or agent thereof) makes any representation or warranty, express or implied, to any other party with respect to this Agreement or the transactions contemplated hereby.  No supplement, modification or waiver of this Agreement (including, without limitation, any schedule hereto) shall be binding unless the same is executed in writing by all parties.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

12.7.   Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by telecopy shall be as effective as delivery of a manually executed counterpart of this Agreement.  In proving enforceability of this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

12.8.   Invalidity.   If any one or more of the provisions contained in this Agreement (other than any of the provisions contained in Article II or Article III hereof) or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the parties shall use their reasonable efforts, including, but not limited to, the amendment of this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the parties hereto on the date hereof.

12.9.   Headings.   The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

12.10. Exclusive Jurisdiction.   Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.4 hereof.

12.11. **Waiver of Right to Trial by Jury. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.**

12.12. Specific Performance. Each of the parties hereto acknowledges that the other party hereto may be irreparably damaged in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached. Accordingly, each of the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions thereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction, in addition to any other remedy to which the parties may be entitled, at law, in equity or pursuant to this Agreement.

12.13. Counting. If the due date for any action to be taken under this Agreement (including, without limitation, the delivery of notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

12.14. No Recording. This Agreement shall not be recorded in the official records of West Feliciana Parish, Louisiana. In the event this Agreement is recorded in violation of this provision, it shall not be deemed to create or establish any right, title or interest affecting the Property, all of which are expressly waived and renounced by Buyer. Should Buyer record this Agreement in the official records of West Feliciana Parish, Louisiana, Seller shall have the right, at it sole discretion, to immediately terminate this Agreement, and thereafter, the Parties hereto shall have no further rights or obligations to one another under this Agreement, except as otherwise provided in this Agreement. If this Agreement is terminated pursuant to this Section 12.14, the Deposit shall become non-refundable and shall be forfeited to the Seller. This section does not prohibit the post-Closing recordation of any documents made or entered into in connection with consummating the purchase and sale of the Purchased Assets.

12.15. No Third Party Beneficiaries. There are no third party beneficiaries of this Agreement. No provision of this agreement is intended or shall be construed to confer upon or to give any person other than the parties to this Agreement, any rights, basis for reliance, or remedies under or by reason of this Agreement, or to create a cause of action for enforcement thereof.

12.16. Opportunity to Consult Counsel, Voluntary Act. Each party to this Agreement acknowledges that it has read this Agreement in its entirety, and has consulted such legal or other advisors as it deems appropriate and understands and agrees to each of the provisions of this Agreement and further acknowledge that it has voluntarily entered into this Agreement.

12.17. Attorneys' Fees. If any action or proceeding is necessary to enforce any of the terms, provisions or conditions of this Agreement, including any claim or demand, or to interpret this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which it may otherwise be entitled, whether or not such action or proceeding is prosecuted to judgment.

12.18. Service of Process. Each party irrevocably consents to the service of process in any action or proceeding by receipt of mailed copies thereof by national courier service or registered United States mail, postage prepaid, return receipt requested, to its address as specified in or pursuant to Section 12.4 hereof. However, the foregoing shall not limit the right of a party to effect service of process on the other party by any other legally available method.

12.19. No Personal Liability. Notwithstanding anything to the contrary contained herein, at law or in equity, no partner, officer, director, member, shareholder, affiliate or attorney of a party shall have any personal liability to the other party or any other person (a) under this Agreement, or (b) as a result of the execution and delivery of this Agreement, and the performance or nonperformance of a party's obligations under this Agreement, or (c) as a result of the sale of the Purchased Assets pursuant to this Agreement, or (d) as a result of a default under this Agreement, or the breach of any warranty, covenant, or representation contained in this Agreement, or (e) otherwise. Notwithstanding anything to the contrary contained herein, the provisions of this Section 12.19 shall survive the Closing or the termination of this Agreement forever, and in the event of a conflict between any other provision of this Agreement and this Section 12.19, the provisions of this Section 12.19 shall prevail.

12.20. Relationship of Parties. Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venture or any association between Seller and Buyer.

12.21. Exhibits and Schedules. The Exhibits and Schedules attached to, delivered with and identified to this Agreement are a part of this Agreement the same as if fully set forth herein and all references herein to any Section of this Agreement shall be deemed to include a reference to any Schedule named therein.Interpretation. Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b) Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c) A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(d) A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e) All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(f) All references to any financial or accounting terms shall be defined in accordance with GAAP.

12.23. <u>Preparation of this Agreement</u>. Buyer and Seller hereby acknowledge that (i) Buyer and Seller jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (ii) both Buyer and Seller have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (iii) no presumption shall be made that any provision of this Agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

**[End of Text]**

**[Two Signature Pages Follow]**

**SIGNED** by West Feliciana Acquisition, LLC, in its capacity as Debtor and Debtor-in-Possession at Baton Rouge, Louisiana, on the _____ day of _____, 2010, in the physical presence of me, Notary Public, and the following competent witnesses.

**Witnesses:**

**West Feliciana Acquisition, LLC,** in its capacity as Debtor and Debtor-in-Possession

_____

By: _____, duly authorized

_____
Typed/Printed Name of Witness

  Allen F. Byrd
Its: CEO

_____

_____
Typed/Printed Name of Witness

Print Name _____
Notary Public for _____
Notary or Bar Id. No. _____
Commission Expires _____

**SIGNED** by _____ at ~~Baton Rouge, Louisiana~~_____,
_____, on the _____ day of _____, 2010, in the
physical presence of me, Notary Public, and the following competent witnesses.

**Witnesses:**
                                    _____—**Amzak**
                                    **Capital Management, LLC**

_____         By: _____ _____, duly authorized
                                         _____
_____         Its: _____
Typed/Printed Name of Witness


_____

_____
Typed/Printed Name of Witness


            Print Name _____
            Notary Public for _____
            Notary or Bar Id. No. _____
            Commission Expires _____

**List of Schedules**

Schedule 2.1(a) - Immovable Property
Schedule 2.1(b) - Excluded Equipment
Schedule 2.1(c) - Assigned Executory Agreements
Schedule 2.1(d) - Licensed Intellectual Property Rights
Schedule 2.1(e) - Purchased Trademarks
Schedule 2.1(f) - Permits
Schedule 2.1 (j) - Insurance Policies
Schedule 2.2(h) - Excluded Agreements
Schedule 2.3    - Excluded Leased Property
Schedule 2.4    - Purchase Price Breakdown
Schedule 2.7(c) - Cure Amounts

## Schedule 2.1(a)

## Immovable Property

A certain tract of land, being Tract 2 located in Sections 47, 48 & 49, T4S-R2W, G.L.D., West Feliciana Parish, Louisiana, and being more particularly described as follows: Starting at the northwest corner of Tract 1 also being the POINT OF BEGINNING; thence proceed South 40 degrees 01 minutes 53 seconds West, a distance of 25.11 feet; thence South 22 degrees 54 minutes 57 seconds West, a distance of 150.45 feet; thence South 69 degrees 52 minutes 50 seconds West, a distance of 2207.69 feet; thence North 07 degrees 02 minutes 14 seconds West, a distance of 113.62 feet; thence North 02 degrees 41 minutes 35 seconds West, a distance of 235.62 feet; thence North 01 degrees 24 minutes 08 seconds East, a distance of 178.31 feet; thence North 01 degrees 24 minutes 51 seconds West, a distance of 247.95 feet; thence North 08 degrees 10 minutes 32 seconds West, a distance of 417.05 feet; thence North 06 degrees 47 minutes 14 seconds West, a distance of 251.32 feet; thence North 03 degrees 50 minutes 59 seconds West, a distance of 421.45 feet; thence North 07 degrees 00 minutes 02 seconds West, a distance of 878.64 feet; thence North 05 degrees 44 minutes 07 seconds West, a distance of 391.30 feet; thence North 73 degrees 55 minutes 41 seconds East, a distance of 3914.74 feet; thence South 82 degrees 00 minutes 10 seconds East, a distance of 1351.28 feet; thence North 43 degrees 16 minutes 53 seconds East, a distance of 33.40 feet; thence North 29 degrees 14 minutes 16 seconds West, a distance of 254.80 feet; thence North 40 degrees 56 minutes 04 seconds West, a distance of 102.70 feet; thence North 19 degrees 26 minutes 28 seconds West, a distance of 199.50 feet; thence North 37 degrees 30 minutes 35 seconds West, a distance of 222.05 feet; thence North 83 degrees 06 minutes 19 seconds East, a distance of 998.47 feet; thence North 87 degrees 54 minutes 00 seconds East, a distance of 2617.72 feet; thence South 00 degrees 01 minutes 02 seconds East, a distance of 1275.53 feet; thence South 73 degrees 57 minutes 32 seconds East, a distance of 770.00 feet; thence South 61 degrees 12 minutes 31 seconds East, a distance of 134.06 feet; thence South 17 degrees 12 minutes 45 seconds East, a distance of 707.91 feet; thence South 26 degrees 49 minutes 49 seconds East, a distance of 393.52 feet; thence South 15 degrees 31 minutes 37 seconds East, a distance of 92.31 feet; thence South 24 degrees 55 minutes 01 seconds West, a distance of 231.29 feet; thence South 59 degrees 59 minutes 03 seconds West, a distance of 330.63 feet; thence South 58 degrees 06 minutes 12 seconds West, a distance of 248.13 feet; thence North 85 degrees 13 minutes 10 seconds West, a distance of 322.36 feet; thence South 68 degrees 42 minutes 27 seconds West, a distance of 878.80 feet; thence North 78 degrees 55 minutes 45 seconds West, a distance of 1040.61 feet; thence South 86 degrees 17 minutes 26 seconds West, a distance of 1455.50 feet; thence North 15 degrees 10 minutes 47 seconds West, a distance of 101.16 feet; thence North 18 degrees 33 minutes 46 seconds West, a distance of 345.73 feet; thence South 69 degrees 11 minutes 54 seconds West, a distance of 630.02 feet; thence South 69 degrees 27 minutes 55 seconds West, a distance of 1759.81 feet; thence South 69 degrees 07 minutes 42 seconds West, a distance of 627.96 feet to the POINT OF BEGINNING. All according to map entitled "Map Showing Resubdivision of The St. Francisville Paper Company Property ... ", dated 8/4/08, Job Number A080235, by Alvin Fairburn and Associates, LLC.

## Schedule 2.1(b)

## Excluded Equipment

See the leased equipment listed on Schedule 2.3 which is incorporated herein as if restated.

**Schedule 2.1(c)**

**Assigned Executory Agreements**

1. American Midstream Base Contract for Sale and Purchase of Natural Gas by and between Mid Louisiana Gas Transmission, LLC and West Feliciana Acquisition, LLC (d/b/a Renew Paper) dated February 1, 2010.
2. Agreement with AT&T Mobility for the provision of cellular phone services.
3. Customer Support Agreement No. WFA06242009-001 by and between Baywood Technologies, Inc. and West Felciana Acquisition, LLC dated July 1, 2009.
4. DRT America, Inc. Purchaser Order made by West Feliciana Acquisition, LLC beginning July 1, 2009 and ending June 30, 2012, for the purchase of Crude Sulfate Turpentine.
5. Agreement with Harrell Gas for the supply of propane.
6. OptiVISION Subscription Services Agreement by and between Honeywell International, Inc. and West Feliciana Acquisition, LLC (for the St. Francisville Mill) dated July 15, 2009.
7. Cooperative Endeavor Agreement by and between Louisiana Department of Economic Development and West Feliciana Acquisition, LLC dated April 1, 2009.
8. Crude Tall Oil and Black Liquor Soap Skimmings Agreement by and between MeadWestvaco Corporation and West Feliciana Acquisition, LLC dated January 1, 2010.
9. Agreement and Amendment to Gloster Amended and Restated Log Processing Agreement dated by and between Gloster Chips, Inc. and West Feliciana Acquisition, LLC dated December 31, 2009.
10. Agreement with the State of Louisiana for River Access and the Water Bottom Lease.
11. Agreement with the Town of Gloster for the Chip Mill Land Lease.