**PACIFIC WEST COMMERCIAL CORPORATION**
Suite 2900, PO Box 11583
650 West Georgia Street
Vancouver, British Columbia  V6B 4N8
Telephone:  604-681-8817
Facsimile:  604-681-8861

**Neil de Gelder**
Direct Line: 604.681.8817
E-mail: ndegelder@sternpartners.com

**PRIVATE & CONFIDENTIAL**

*Via Electronic Mail*

April 5, 2010

West Feliciana Acquisition, LLC
2105 LA Highway 964
St. Francisville, Louisiana 70775
Attention: Mr. Allen F. Byrd
Email: Allen.Byrd@renewpaper.com
Fax.: 225-336-2894

Gordon, Arata, McCollam, Duplantis & Eagan LLP
One American Place
301 Main Street
Baton Rouge, Louisiana 70801-1916
Attention: Mr. Peter Kopfinger, Esq.
Email: PKopfinger@gordonarata.com
Fax.: 225-336-9763

Re:    **St. Francisville Mill**

We are pleased to submit this letter in connection with our bid to purchase the assets relating to the pulp and paper mill located in St. Francisville, Louisiana on the terms and conditions set out in the attached Purchase and Sale Agreement (the "Purchase Agreement").  Capitalized terms used but not defined in this letter have the meanings ascribed to them in the Bidding and Sale Procedures.

We are attaching a clean and duly executed Purchase Agreement revised to reflect our proposed variations from the form agreement provided to us, as well as a marked Purchase Agreement setting out our proposed variations.

As required by the Bidding and Sale Procedures, we confirm that our offer is irrevocable until three days following the Closing if we are notified that our bid is the Lead Bid or the Secondary Bid by commencement of the Auction.  Otherwise, our offer is automatically

revoked at 12:01 a.m. on April 8, 2010.

As required by the Bidding and Sale Procedures, we attach to this letter a certification of the written consent of the board of directors of Pacific West Commercial Corporation ("Pacific West"), which demonstrates our authority to make a binding and irrevocable bid on the terms proposed in the Purchase Agreement. Prior to Closing, Pacific West will incorporate one or more affiliated corporations to acquire the Assets.

Pacific West confirms that it has the internal capital resources available to complete the proposed acquisition of the Assets. If you need to confirm our financial ability, we would be pleased to arrange a call with one of our bankers. As set forth in the Purchase Agreement, the bid is not conditioned on, or subject to, further due diligence or the obtaining of financing.

Our Purchase Agreement designates executory contracts and unexpired leases for assumption and provides for payment of cure costs, subject to the right to designate or eliminate contracts and leases up to the closing of the sale.

If Pacific West is the Winning Bidder, we expect to make offers of employment to between 65%-80% of the employees of WFA at the time of the shutdown, subject to our meetings with, and reviews of, all potential applicants.

As required by the Bidding and Sale Procedures, we acknowledge and represent that: (A) we have had an opportunity to conduct any and all required due diligence regarding the Assets prior to making our offer; (B) we have relied solely upon our own independent review, investigation and/or inspection of any documents and/or Assets in making our offer; (C) we did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the Purchase Agreement; and (D) we are not entitled to any expense reimbursement or break-up fee of any other kind or type of fee or expense, in connection our bid.

As further required by the Bidding and Sale Procedures, we submit to the core jurisdiction of the Bankruptcy Court and will waive the right to a jury trial, to the extent such right exists.

The representatives of PWCC who be attending the Auction are Mr. Brian Konen, Mr. Bob Keach, our counsel, and Mr. Steven Strohshein, our local counsel. They are duly authorized to bid on our behalf at the Auction. We understand that the Assets are being sold in one single transaction and that bids will not be accepted for only a portion of the Assets.

Simultaneously with the submission of this letter, we have authorized a wire transfer in the amount of US$50,000 to Gordon, Arata, McCollam, Duplantis & Eagan, L.L.P.,

counsel to WFA, as escrow agent, as required by the Bidding and Sale Procedures. These funds represent the Deposit described in the Bidding and Sale Procedures and are being wired on the condition that (i) they are returned promptly to us following the Sale Order if we are not selected as the Winning Bidder or Back-Up Bidder, (ii) if we are selected as the Back-Up Bidder, they are returned promptly to us following consummation of the Sale Transaction with the Winning Bidder, and (iii) they are otherwise held according to the terms of the Bidding Procedures and the APA.

We appreciate your consideration of our bid. Please contact me at 604-681-8817 or ndegelder@sternpartners.com with any questions or comments.

Yours truly,

Neil de Gelder

cc:     Brian Konen (West Linn Paper Company)
        Bob Keach (Bernstein, Shur, Sawyer & Nelson, P.A.)
        Steven Strohshein (McGlinchey Stafford, PLLC)

# PURCHASE AND SALE AGREEMENT

**by and between**

**West Feliciana Acquisition, LLC, in its**

**capacity as Debtor and Debtor-in-Possession**

**as Seller**

**and**

**Pacific West Commercial Corporation or its Designee**

**As Buyer**

**[April 5, 2010]**

# Purchase and Sale Agreement

This Purchase and Sale Agreement (this "<u>Agreement</u>") is dated and effective on April 5, 2010 by and between West Feliciana Acquisition, LLC, a Delaware limited liability company, in its capacity as Debtor and Debtor-in-Possession ("<u>Seller</u>"), and Pacific West Commercial Corporation, a British Columbia corporation, or its designee ("<u>Buyer</u>").

## Preliminary Statements

A.      Seller was engaged in the business of operating a paper mill located in St. Francisville, Louisiana (the "<u>Mill</u>");

B.      Seller commenced a case, bearing Case No. 10-10053 (the "<u>Case</u>") under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on January 17, 2010 by filing a voluntary petition with the United States Bankruptcy Court for the Middle District of Louisiana (the "<u>Bankruptcy Court</u>");

C.      Seller was authorized to sell substantially all of the assets associated with the operation of the Mill (the "<u>Business</u>") pursuant to the Bankruptcy Courts' Order dated and entered on March 5, 2010; and

D.      Seller wishes to sell to Buyer and Buyer wishes to purchase from Seller substantially all the assets associated with the operation of the Mill and to assume from Seller the Assumed Liabilities (as defined in <u>Section 2.7</u>), pursuant to, <u>inter alia</u> Sections 363 and 365 of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure, and upon the terms and subject to the conditions of this Agreement.

## Agreement

In consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

ARTICLE I
DEFINITIONS

1.1.      <u>Defined Terms</u>As used herein, the terms below shall have the following respective meanings:

"<u>Affiliate</u>" shall mean all parties falling within the definition of affiliate under either (i) Rule 12b-2 of the General Rules and Regulations of the Securities Exchange Act of 1934, as amended, or (ii) Section 101(2) of the Bankruptcy Code.

"<u>Approval Order</u>" means that certain Order to be entered by the Bankruptcy Court in connection with its approval of the sale of the Purchased Assets as in form and substance

reasonably satisfactory to the Buyer and its counsel and containing, without limitation, the terms set forth in section 7.1(b).

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"Environmental Liabilities" means any debts, adverse claims, liabilities, commitments, responsibilities, and obligations which may arise from or relate to any violation of or non-compliance with Environmental Laws.

"GAAP" shall mean United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" shall mean any (i) federal, state, local, municipal, foreign or other government; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (iii) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Intellectual Property Rights" shall mean patents, patent applications, inventions, know-how, technology, trade secrets, trademarks, trademark registrations, trademark applications, trade-names, trade secrets, know-how, copyrights, copyright applications, copyright registrations, computer software, databases and any and all other intellectual property rights.

"Law" shall mean any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, principle of common law, judgment enacted, promulgated, issued, enforced or entered by any Governmental Entity, or other requirement or rule of law.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, Environmental Liabilities, and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records.

"Licensed Intellectual Property Rights" means all Intellectual Property Rights, other than Trademarks, owned by a third party and licensed or sublicensed to Seller and related to the operation of the Business.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, easement, lien, interest (as such term is defined or used in the Bankruptcy Code) security interest, right-of-way, encroachment, mortgage, deed of trust or other encumbrance or any conditional sale contract, title retention contract or other contract to give any of the foregoing.

"Material Adverse Effect" shall mean any development which could be reasonably expected to delay or prevent the consummation of the transactions contemplated hereby or which could be reasonably expected to materially and adversely affect the use or value of the Purchased Assets (as defined herein), taken as a whole.

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation or award of any Governmental Entity or private arbitration tribunal.

"Ordinary Course of Business" means the ordinary course of the Business during the period the Mill was actively operated from July 15, 2009 until February 5, 2010.

"Owned Intellectual Property Rights" means all Intellectual Property Rights, other than Trademarks, owned by Seller and related to the operation of the Business in the Ordinary Course of Business.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"Proceeding" shall mean any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity or arbitrator.

"Representative" shall mean, with respect to any Person, such Person's officers, directors, employees, agents and representatives (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

"Sale Hearing" shall mean the hearing to be scheduled and conducted by the Bankruptcy Court to consider approval and entry of the Approval Order.

"Sale Motion" shall mean the motion or motions of Seller seeking approval of the sale procedures and entry of the Approval Order.

"Tax" or "Taxes" shall mean any federal, state, county, local, foreign and other income, profits, gains, net worth, sales and use, ad valorem, gross receipts, business and occupation, license, estimated, stamp, custom duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employees, income withholding, social security, unemployment or other tax, together with any penalty, addition or interest with respect thereto.

"Tax Code" shall mean the Internal Revenue Code of 1986, as amended.

"Tax Return" shall mean any return, report, declaration or information return or statement relating to Taxes.

1.2.    Other Defined Terms.The following additional terms shall have the meanings defined for such terms in the Sections set forth below:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Assigned Executory Agreements | 2.1(c) |

| Term | Section |
| --- | --- |
| Assumed Liabilities | 2.7 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Books and Records | 2.1(g) |
| Business | Recitals |
| Buyer | Recitals |
| Case | Recitals |
| Closing | 3.1(a) |
| Closing Date | 3.1(a) |
| Competing Transaction | 6.6 |
| Cure Amounts | 2.7(c) |
| Equipment | 2.1(b) |
| Excluded Executory Agreements | 2.2(h) |
| Excluded Liabilities | 2.8 |
| Immovable Property | 2.1(a) |
| Insurance Policies | 2.1(j) |
| Leased Property | 2.3 |
| Permits | 2.1(f) |
| Purchase Price | 2.4 |
| Purchased Assets | 2.1 |
| Purchased Trademarks | 2.1(e) |
| Seller | Recitals |

1.3. <u>Other Definitional Provisions.</u>The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b) The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

ARTICLE II
AGREEMENT TO PURCHASE AND SELL AND CONSIDERATION

2.1. <u>Sale and Purchase.</u>Subject to Section 2.2, Section 2.3, the other provisions of this Agreement and the Approval Order, at Closing, Seller agrees to sell, convey, assign, transfer and deliver to Buyer, and Buyer agrees to purchase, acquire, and accept, without any warranty whatsoever, but in any event free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. §363(b) and (f), all right, title and interest of Seller in and to the assets used by Seller in the conduct of the Business immediately prior to shutdown of the Business, but excluding the Excluded Assets and the Leased Property (collectively, the "<u>Purchased Assets</u>"), as specified below:

(a) the immovable property set forth in <u>Schedule 2.1(a)</u>, together with all buildings and improvements located thereon and privileges and servitudes appurtenant thereto (the "<u>Immovable Property</u>");

(b)    all machinery, equipment, auxiliary equipment, vehicles, fixtures attached to or associated with the equipment or machinery, machine parts, shop tools and equipment, spare parts, supplies, office equipment, furniture, furnishings, office supplies and other tangible personal property located on the Immovable Property as of March 30, 2010,as well as any of such property located off site at any location, including, without limitation, parts, rolls and other equipment sent off site for repair (the "Equipment").  Notwithstanding anything to the contrary herein, and in express reliance on the conveyancing instruments from Tembec USA, LLC to Seller (and without any representation as to the title of Tembec USA, LLC or its affiliates), the Seller warrants and represents that Seller is the owner of the Equipment and that the Equipment, unless otherwise disclosed in this Agreement, is not leased to Seller.  For purposes of clarity, the foregoing statement is not intended as a warranty of title, but rather an expression of the extent of Seller's knowledge, information and belief as to the ownership of the Equipment.

(c)    subject to assumption and assignment, all of the Seller's interest in and to the contracts, and leases listed on Schedule 2.1(c) and, at Buyer's option, referred to in section 2.3 and listed on Schedule 2.3 (the "Assigned Executory Agreements"), except as provided in Section 2.2 (h);  Buyer reserves the right to add or remove executory contracts and unexpired leases to or from Schedule 2.1(c) at any time up to the Closing Date under this Agreement; the final schedule of Assigned Executory Agreements will be settled at Closing (the "Final Executory Contracts Schedule) and the contracts and leases listed on the Final Executory Contracts Schedule shall constitute the Assigned Executory Agreements under this Agreement.

(d)    to the extent assignable or transferable and subject to approval by the applicable licensor, and Seller shall use commercially reasonableits best efforts to assist the Buyer in obtaining any and all consents or approvals required to accomplish the transfer and/or assignment of such property rights and/or contracts, all Licensed Intellectual Property Rights used or held for use in the Business, including but not limited to those Licensed Intellectual Property Rights listed on Schedule 2.1(d).

(e)    all Trademarks listed on Schedule 2.1(e) (the "Purchased Trademarks") and all Owned Intellectual Property;

(f)    to the extent assignable or transferable, and Seller shall use commercially reasonable its best efforts to assist the Buyer in obtaining any and all consents or approvals required to accomplish the transfer and/or assignment of such property rights and/or contracts, all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental Entity used or held for use in the Business in the Ordinary Course of Business, including but not limited to those licenses, permits and governmental authorizations listed on Schedule 2.01(f) (the "Permits");

(g)    all books, records, files and papers, whether in hard copy or computer format relating to the Purchased Assets or the Business, including, without limitation, engineering information, sales and promotional literature, manuals and data, sales and purchase correspondence, and lists of former suppliers, but excluding the books and records described in Section 2.2 (such included items, the "Books and Records");

(h)     to the extent assignable or transferable, and Seller shall use commercially reasonableits best efforts to assist the Buyer in obtaining any and all consents or approvals required to accomplish the transfer and/or assignment of such property rights and/or contracts, any warranties and/or indemnification rights of Seller related to the Purchase Assets;

(i)     all other assets and properties of Seller or its Affiliates used or held for use in connection with the Business except as otherwise provided in Section 2.2; and (j)          at the sole option of Buyer and to the extent assignable, and Seller shall use commercially reasonableits best efforts to assist the Buyer in obtaining any and all consents or approvals required to accomplish the transfer and/or assignment of such property rights and/or contracts, all insurance policies listed on Schedule 2.1(j), subject to the agreement and/or approval of the respective insurance companies and/or their underwriters, as applicable (the "Insurance Policies").

2.2.     Excluded Assets. Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer expressly understands and agrees that the following assets and properties of Seller (the "Excluded Assets") shall be excluded from the Purchased Assets:

(a)     all cash and cash equivalents on hand and in banks, and all cash equivalents and marketable securities, accounts receivable, if any, in each case, as of the close of business on the Business Day immediately preceding the Closing;

(b)     all rights to any cancellation value of any insurance policies as of the Closing, other than any policies listed on Schedule 2.1(j);

(c)     all rights of Seller under this Agreement or any other Closing documents to be delivered by Seller;

(d)     the Tax and Tax related records such as invoices (excluding ad valorem Taxes related to the Immovable Property and Equipment), minute books, stock transfer books and corporate seal of Seller;

(e)     the rights and claims to Tax refunds related to the Business or the Purchased Assets, relating to taxable periods ending on or prior to the Closing, regardless of whether the refunds or credits are realized following the Closing;

(f)     all assets (including books and records) related to any pension, profit sharing, stock bonus, stock option, thrift or other retirement plan, medical, hospitalization, dental, life, disability, vacation or other insurance or benefit plan, employee stock ownership plan, deferred compensation, stock ownership, stock purchase, bonus, benefit or other incentive plan, severance plan or other similar plan covering or applicable to Seller or its employees, whether or not sponsored by Seller and including plans sponsored by Seller's Affiliates;

(g)     all of Seller's claims and causes of action under Chapter 5 of Chapter 11 of Title 11 of United States Code (the "Bankruptcy Code") including, without limitation, under Sections 502, 510, 541, 542, 544, 545, 547-551, 553, and 558 of the Bankruptcy Code, and any other avoidance action under the Bankruptcy Code and all proceeds therefrom; and

(h)      all contracts and leases not listed on Schedule 2.1(c), including, without limitation, the contracts and leases listed on Schedule 2.2(h) (the "Excluded Executory Agreements").

2.3.    Leased Property.

The property listed on Schedule 2.3 is property subject to unexpired leases and will not be conveyed to Buyer, provided, however, that at Buyer's option, the Seller shall assume and assign its rights under any such lease to Seller.

2.4.    Purchase PriceIn consideration for purchasing the Purchased Assets and subject to the terms and conditions of this Agreement, Buyer will assume the Assumed Liabilities as provided in Section 2.7 and will pay to Seller the consideration described on Schedule 2.4, all at the Closing. _____.

2.5    Deposit.

Buyer has given a deposit in the amount of $50,000 to Seller's counsel, as escrow agent.  The deposit shall not be considered earnest money as defined in Louisiana Civil Code article 2624.  If the transaction contemplated by this Agreement is consummated in accordance with this Agreement, then the Deposit will be applied against the Purchase Price at Closing.  The balance of the Purchase Price after application of the Deposit will be paid to Seller at the Closing.  Return or forfeiture of the Deposit shall be in accordance with the Bidding and Sale Procedures attached hereto and made a part hereof as Exhibit A to this Agreement.

2.6.    Liabilities to be Assumed by Buyer.

Upon the transfer of the Purchased Assets on the Closing Date, Buyer shall assume, pay and/or perform when due and discharge the following Liabilities of Seller (collectively, the "Assumed Liabilities"):

(a)      Any and all Liabilities associated with, or in any way relating to, the Purchased Assets that arise after the Closing and that relate to the period from and after the Closing Date;

(b)      And the cure amounts (or a lesser amount) listed on Schedule 2.7(c) ("Cure Amounts")  and/or otherwise determined as to the Assigned Executory Agreements; and

(b)(c)    Accrued Ad valorem taxes on immovable property and taxes on movable property with respect to the Purchased Assets. not to exceed $200,000.

2.7    Excluded Liabilities.

Except as otherwise set forth in this Agreement, Buyer shall not assume, and shall be deemed not to have assumed, any Liabilities except for the Assumed Liabilities (collectively, the "Excluded Liabilities"), except that any Liabilities associated with the Purchased Assets to which Buyer, as owner of the Purchased Assets, would be subject by operation of law, notwithstanding the Approval Order, shall not be Excluded Liabilities, provided, however, that

nothing herein shall imply that Buyer has assumed or is otherwise liable for any Taxes or Environmental Liabilities existing as of, or relating to the period on or prior to, the date of the Closing of this Agreement or arising prior to the Closing Date, whether arising out of ownership of the Purchased Assets or otherwise arising.

ARTICLE III
CLOSING

3.1.    <u>Closing; Transfer of Possession; Certain Deliveries.</u>Unless this Agreement is terminated and the transaction contemplated herein is abandoned pursuant to Article VIII hereof, the closing of the transaction contemplated herein (the "<u>Closing</u>") will take place on or before April 16, 2010 or on such other date as the parties hereto shall mutually agree, such date to be as soon as practicable following entry of the Approval Order.  The Closing shall be held at the offices of McGlinchey Stafford PLLC, One American Place, Baton Rouge, LA, at 10:00 a.m., local time, unless the parties hereto otherwise agree.  The actual time and date of the Closing are herein called the "<u>Closing Date</u>."

(b)    At the Closing, Seller shall deliver to Buyer:

(i)    A duly executed Act of Sale substantially in the form attached hereto as <u>Exhibit B and otherwise satisfactory to Buyer and its counsel</u>;

(ii)    A duly executed Bill of Sale substantially in the form attached hereto as <u>Exhibit C and otherwise satisfactory to Buyer and its counsel</u>;

(iii)    Documentation reasonably required by Buyer's counsel showing that Seller has the authority to enter into this Agreement, to execute the Closing documents contemplated herein and to convey title to the Purchased Assets;

(iv)    Seller's affidavit setting forth its Taxpayer Identification Number, office address, and a statement that it is not a "foreign person" as defined in Internal Revenue Code §1445, as amended;

(v)    A copy of the Approval Order in form and content <u>reasonably</u> satisfactory to Buyer and containing, without limitation, the terms and conditions set forth in section 7.1(b);

(vi)    The officer's certificate required to be delivered pursuant to <u>Section 7.2(c)</u> hereof; and

(vii)    All other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be reasonably necessary to convey the Purchased Assets to Buyer or Buyer's designee.

(c)    At the Closing, Buyer shall deliver to Seller:

(i)    The cash component of the Purchase Price to be paid by wire transfer to an account or accounts designated by Seller and the preferred share component

of the Purchase Price to be satisfied by delivery to Seller of a share certificate representing such preferred shares;

(ii)     Documentation such as a company resolution or written consent, reasonably required by Seller's counsel showing that Buyer has the authority to enter into this Agreement, to execute the Closing documents contemplated herein and to accept title to the Purchased Assets and assume the Assumed Liabilities; and

(iii)    The officer's certificate required to be delivered pursuant to Section 7.3(c) hereof.

(d)     Seller and Buyer hereby acknowledge that Internal Revenue Code Section 6045 requires the entity closing a real estate transaction to report the terms of the transaction to the Internal Revenue Service

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

4.1.     Existence; Good Standing and Power.Seller is a limited liability company validly existing and in good standing under the laws of Delaware.  Subject to entry of the Approval Order, Seller has all requisite power and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by Seller and to perform its obligations hereunder and thereunder.

4.2.     Authority.The execution, delivery and performance of this Agreement and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all necessary company action on the part of Seller.

4.3.     Execution and Binding Effect.This Agreement has been duly and validly executed and delivered by Seller, and, following entry of the Approval Order, this Agreement and the transaction contemplated hereby constitute (assuming in each case the due and valid authorization, execution and delivery thereof by the other parties hereto), a valid and legally binding obligation of Seller enforceable against Seller in accordance with its respective terms.

4.4.     No Violation.The execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby, do not and will not conflict with or result in, with or without the giving of notice or lapse of time or both, any violation of or constitute a breach or default, or give rise to any right of acceleration, payment, amendment, cancellation or termination, under (a) the certificate of formation, limited liability company operating agreement of Seller or any resolution or written consent adopted by the board of managers or the members of Seller and not rescinded, (b) subject to entry of the Approval Order, any agreement or other instrument to which Seller is a party or by which Seller or any of the Purchased Assets is bound, (c) subject to entry of the Approval Order, any Order of any Governmental Entity to which Seller is bound or subject, (d) subject to entry of the Approval Order, any Law applicable to Seller or

any of its respective properties or assets or (e) except as provided for herein, result in the imposition or creation of any Lien upon or with respect to any of the Purchased Assets.

4.5.    Brokers and Finders.Seller has employed Poyry Forest Industry Consulting, Inc. ("Poyry") in connection with the transactions contemplated by this Agreement. All payments due to Poyry are the sole responsibility of Seller and will be made in accordance with the Retention Agreement between Seller and Poyry dated January 29, 2010 and the Bankruptcy Court's Order dated February 26, 2010 approving the retention of Poyry. Buyer shall have no responsibility or liability for any fees or commissions of Poyry or any other broker, advisor or finder. Seller represents that there are no other brokers, advisors or finders who could claim any commissions or fees with respect to the transactions described in this Agreement.

4.6.    Limitations on Seller's Representations and Warranties.Except for the representations and warranties contained in this Agreement, Seller makes no other express or implied representation or warranty, including, without limitation, representations or warranties as to the condition of the Purchased Assets, their contents, the income derived or potentially to be derived from the Purchased Assets, or the expenses incurred or potentially to be incurred in connection with the Purchased Assets.  Seller is not, and will not be, liable or bound in any manner by express or implied warranties, guarantees, statements, promises, representations or information pertaining to the Purchased Assets or the Business, made or furnished by any broker, agent, employee, servant or other person representing or purporting to represent Seller, unless and to the extent the same is expressly set forth in this Agreement.

4.7.    Condition of Property and Waivers.

THE SALE OF THE PURCHASED ASSETS IS MADE AND ACCEPTED ON AN "AS IS" AND "WHERE IS" BASIS WITH ALL FAULTS OR DEFECTS, WHETHER LATENT OR APPARENT, KNOWN OR UNKNOWN AND WITH NO LEGAL WARRANTIES WHATSOEVER, BY SELLER ALL OF WHICH ARE EXPRESSLY WAIVED. BUYER, FOR ITSELF AND ON BEHALF OF ITS ASSIGNS AND TRANSFEREES, ACCEPTS THE PURCHASED ASSETS IN THE CONDITION AS EXISTING AT THE TIME OF SALE. EXCEPT AS CONTAINED IN THIS AGREEMENT OR THE CLOSING DOCUMENTS, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING TITLE OR OWNERSHIP TO THE PURCHASED ASSETS, THE ABSENCE OF LIENS OR ENCUMBRANCES, THE CONDITION OF THE PURCHASED ASSETS, OR ANY PARTS THEREOF, INCLUDING, WITHOUT LIMITATION, THE SOIL CONDITION, THE FITNESS OF THE PURCHASED ASSETS FOR ANY PURPOSE OR INTENDED USE, THE PRESENCE OR ABSENCE OF APPARENT OR HIDDEN DEFECTS, THE PRESENCE OR ABSENCE OF ENVIRONMENTAL CONTAMINATION, OR THE COMPLIANCE OF THE PURCHASED ASSETS WITH ANY APPLICABLE LAWS, RULES OR REGULATIONS, ALL OF WHICH WARRANTIES ARE HEREBY EXPRESSLY WAIVED BY BUYER.  BUYER FULLY AND COMPLETELY WAIVES ANY AND ALL RIGHTS FOR THE RETURN OF ALL OR ANY PART OF THE PURCHASE PRICE BY THE REASON OF ANY SUCH DEFECTS.  BUYER ACKNOWLEDGES AND DECLARES THAT NEITHER SELLER NOR ANY PARTY, WHOMSOEVER, ACTING OR PURPORTING TO ACT IN ANY CAPACITY WHATSOEVER ON BEHALF OF SELLER, HAS MADE ANY DIRECT, INDIRECT,

EXPLICIT OR IMPLICIT STATEMENT, REPRESENTATION OR DECLARATION, WHETHER BY WRITTEN OR ORAL STATEMENT OR OTHERWISE, AND UPON WHICH BUYER HAS RELIED, CONCERNING TITLE TO THE PURCHASED ASSETS, THE ABSENCE OF ANY LIENS OR ENCUMBRANCES, THE EXISTENCE OR NON-EXISTENCE OF ANY QUALITY, CHARACTERISTIC OR CONDITION OF THE PURCHASED ASSETS, ~~EXCEPT AS CONTAINED IN THIS AGREEMENT OR THE CLOSING DOCUMENTS. EXCEPT AS CONTAINED IN THIS AGREEMENT OR THE CLOSING DOCUMENTS,~~ BUYER EXPRESSLY WAIVES ALL LEGAL WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTY OF OWNERSHIP, WARRANTY OF PEACEFUL POSSESSION, WARRANTY OF TITLE, WARRANTY AGAINST EVICTION, WARRANTY OF ABSENCE OF LIENS AND ENCUMBRANCES, THE WARRANTY OF FITNESS AND THE WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS, WHETHER APPARENT OR LATENT, IMPOSED BY LOUISIANA CIVIL CODE ARTICLES 2475, 2500 AND 2520, ANY OTHER APPLICABLE STATE OR FEDERAL LAW, AND THE JURISPRUDENCE THEREUNDER. BUYER ALSO WAIVES ANY RIGHTS IT MAY HAVE IN REDHIBITION OR TO A REDUCTION OF PURCHASE PRICE PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520 THROUGH 2548, INCLUSIVE, IN CONNECTION WITH THE PURCHASED ASSETS. BY ITS SIGNATURE, BUYER EXPRESSLY ACKNOWLEDGES ALL SUCH WAIVERS AND ITS EXERCISE OF BUYER'S RIGHT TO WAIVE WARRANTY PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2503 AND 2548. BUYER AGREES THAT BUYER HAS CONDUCTED ITS OWN EVALUATION AND INSPECTION AND HAS MADE ITS OWN DETERMINATION AS TO ANY CONDITION OF THE PURCHASED ASSETS, ANY DEFECTS THEREIN, AND THE SUITABILITY AND FITNESS OF THE PURCHASED ASSETS FOR BUYER'S INTENDED USE(S).

4.8.    <u>Additional Environmental Waivers</u>.

BUYER, FOR ITSELF AND ITS ASSIGNS AND TRANSFEREES HEREBY ACCEPTS THE PURCHASED ASSETS IN THE EXISTING ENVIRONMENTAL CONDITION AND WAIVES, DISCHARGES, AND RELEASES SELLER, ITS AFFILIATES, ASSIGNS, SHAREHOLDERS, OFFICERS, EMPLOYEES, DIRECTORS<u>, AGENTS AND REPRESENTATIVES</u> AND INSURERS FROM ANY AND ALL CLAIMS AND/OR CAUSES OF ACTION WHICH BUYER OR ITS ASSIGNS OR TRANSFEREES MAY HAVE OR HEREAFTER BE OTHERWISE ENTITLED TO, WHETHER AFFECTING PERSON AND/OR PROPERTY, FOR ANY ENVIRONMENTAL LIABILITIES ARISING FROM THE PURCHASED ASSETS, INCLUDING ANY CLAIMS, DEMANDS, CAUSES OF ACTIONS (BOTH PUBLIC AND PRIVATE), JUDGMENTS, ATTORNEYS' FEES, COSTS, EXPENSES, PENALTIES AND FINES, IMPOSED OR ASSESSED UNDER ANY AND ALL FEDERAL, STATE OR LOCAL ENVIRONMENTAL LAW, RULE, REGULATION, RULING OR ORDINANCE, OR THE LIKE, INVOLVING THE ENVIRONMENT INCLUDING, BUT NOT LIMITED TO, ARTICLE 2315.3 OF THE LOUISIANA CIVIL CODE, THE LOUISIANA ABANDONED OILFIELD WASTE STATE LAW (La. R.S. 30:71 *et seq.*), THE LOUISIANA ENVIRONMENTAL QUALITY ACT (La. R.S. 30:2001 *et seq.*), THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT, (42 U.S.C. §9601 *et seq.*), THE RESOURCE CONSERVATION AND RECOVERY ACT (42 U.S.C. §6901 *et seq.*), THE SUPERFUND AMENDMENTS AND

REAUTHORIZATION ACT OF 1986, AND THE TOXIC SUBSTANCE CONTROL ACT (15 U.S.C. §2601 *et seq.*), AS ALL OF THE ABOVE MAY BE AMENDED FROM TIME TO TIME (COLLECTIVELY, "<u>ENVIRONMENTAL LAWS</u>").

4.9.     <u>Acknowledgment</u>.

BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER IS HEREBY TRANSFERRING ITS RIGHT, TITLE AND INTEREST IN AND TO THE PURCHASED ASSETS "AS IS," "WHERE IS" AND "WITH ALL FAULTS" AND WITHOUT ANY WARRANTY OR RECOURSE WHATSOEVER, NOT EVEN AS TO THE RETURN OF ALL OR ANY PART OF THE PURCHASE PRICE, AND WITH THE SOLE PERIL AND RISK OF EVICTION BEING ASSUMED BY BUYER, BUT WITH FULL SUBSTITUTION AND SUBROGATION IN AND TO ALL OF THE RIGHTS AND ACTIONS OF WARRANTY WHICH SELLER HAS OR MAY HAVE AGAINST ALL PRECEDING OWNERS OR VENDORS.

4.10.     <u>Act of Sale; Bill of Sale</u>.

The waivers of warranty shall be effective as of and contained in the Act of Sale and the Bill of Sale.

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1.     <u>Existence, Good Standing and Power</u>.Buyer is validly existing and in good standing under the laws of its jurisdiction of incorporation.  Buyer has all requisite power and authority to conduct its business as presently conducted, to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and to perform its obligations hereunder and thereunder.

5.2.     <u>Authority</u>.The execution, delivery and performance of this Agreement and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Buyer.

5.3     Execution and Binding Effect.This Agreement has been duly and validly executed and delivered by Buyer and, following entry of the Approval Order, this Agreement and the transaction contemplated hereby constitutes (assuming, in each case, the due and valid authorization, execution and delivery thereof by the other parties hereto) a valid and legally binding obligation of Buyer, enforceable against it in accordance with its terms.

5.4     No Violation.The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby, do not and will not conflict with or result in, with or without the giving of notice or lapse of time or both, any violation of or constitute a breach or default, or give rise to any right of acceleration, payment, amendment, cancellation or termination, under (a) the organizational documents of Buyer or any resolution or written consent adopted by the board of directors of Buyer and not rescinded, (b) any agreement or other instrument to which Buyer is a party or by which Buyer or any of its respective properties or assets is bound, (c) any Order of any Governmental Entity to which Buyer is bound or subject or (d) any Law applicable to Buyer or any of its respective properties or assets.

5.5     Third Party Approvals.The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons which have not been obtained by Buyer, other than the approval of the Bankruptcy Court pursuant to the Approval Order.

5.6     Brokers and Finders.Buyer has not employed any broker or finder or incurred any liability for any brokerage fees, commissions, finders, or similar fees in connection with the transactions contemplated by this Agreement.

5.7     No Continuation of Business.Buyer's business is neither a continuation of, nor is it related to, the business of Seller, and Buyer covenants and agrees that it will not, in any way, represent that its business is a continuation of or related to the business of Seller.

5.8     Financing.Buyer acknowledges and agrees that the purchase of the Purchased Assets is not subject to any financing contingency whatsoever and that on the Closing Date, Buyer will have sufficient funds on hand or committed lines of credit to consummate the transactions contemplated by this Agreement.

## ARTICLE VI
## COVENANTS OF THE PARTIES

6.1.     Preservation of Purchased Assets.From and after the date hereof and until the Closing Date, except as may be contemplated or permitted by this Agreement, Seller will use commercially reasonable efforts in the context of the Case to maintain the condition of the Purchased Assets.  Seller agrees that it: (i) will maintain all existing security measures that currently protect such Purchased Assets or the Immovable Property; and (ii) will continue to take such actions and maintain all conditions as are required to ensure that the Purchased Assets remain in the conditions existing on the date hereof on the Closing Date, subject to normal wear and tear.

6.2.     Access. Buyer acknowledges and agrees that the purchase of the Purchased Assets is not subject to any additional due diligence and that Buyer has conducted all tests and investigations and other due diligence that is deems necessary and appropriate to purchase the Purchased Assets.  Buyer has not permitted any lien to be filed against the Purchased Assets arising out of Buyer's investigation, inspections or tests.  Buyer shall indemnify, defend and hold Seller harmless from and against any and all claims, charges, actions, costs, suits, damages, injuries, liens, or other liabilities which arise, either directly or indirectly, from Buyer's or its contractors, agents or representatives inspection of the Purchased Assets. The provisions of this Section 6.2 setting forth Buyer's obligations, including the indemnification, defense and hold harmless provisions herein, shall survive the Closing or any termination of this Agreement.  In connection with all such investigation, inspections or testing, Buyer represents that it has not caused or permitted any alteration or damage to any portion of the Purchased Assets and has promptly restored the Purchased Assets to the condition prior, if any alteration or damage results.

6.3.     Reasonable Efforts. Upon the terms and subject to the conditions herein provided, each of the parties hereto shall use its respective reasonable, good faith efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable under applicable Laws and regulations to ensure that the conditions set forth in this Agreement are satisfied and to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.  Without limiting the generality of the foregoing, the parties hereto shall furnish to each other such necessary information and reasonable assistance, as each may request in connection with Seller's preparation and filing of applications and motion papers, including the Sale Motion needed to obtain Bankruptcy Court approval of the transactions contemplated by this Agreement and shall execute any additional instruments necessary to consummate the transactions contemplated hereby, whether before or after the Closing.

6.4.     Notification of Certain Matters Seller shall give prompt notice to Buyer, and Buyer shall give prompt notice to Seller, of (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby or the entry of the Approval Order; and (iii) any material damage to the Purchased Assets that occurs after the execution of this Agreement.

6.5.     Further Assurances On and after the Closing Date, the parties shall take all appropriate action and shall execute all documents, instruments or conveyances of any kind that may be reasonably necessary or advisable to carry out any of the provisions hereof.

6.6.     Competing Transaction From the date hereof (and any prior time) and until the Bid Deadline (as set forth in the Bidding and Sale Procedures), Seller is permitted to cause its Representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and Representatives) in connection with any sale or other disposition of the Purchased Assets (a "Competing Transaction").  In addition, Seller may have the responsibility and obligation under the Bankruptcy Code or other applicable law to respond to any inquiries or offers to purchase the Purchased Assets and perform any and all other acts related thereto, including, without

limitation, supplying information relating to the Business and Purchased Assets to prospective buyers.

## ARTICLE VII
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1. <u>Conditions Precedent to Obligations of Buyer and Seller</u>.The respective obligations of Buyer, on the one hand, and Seller, on the other hand, to close the transactions contemplated under this Agreement shall be subject to the satisfaction (or waiver by the other party) at or prior to the Closing Date of the following conditions:

(a) <u>No Injunction</u>.  No preliminary or permanent injunction or other order issued by, and no Proceeding or Order by or before any Governmental Entity in the United States or by any United States Governmental Entity nor any Law or Order promulgated or enacted by any United States Governmental Entity shall be in effect or pending which materially delays, restrains, enjoins or otherwise prohibits or seeks to restrain, enjoin or otherwise prohibit the transaction contemplated hereby.

(b) <u>Bankruptcy Court Authorization</u>.  The Bankruptcy Court shall have entered the Approval Order.  The "<u>Approval Order</u>" shall be an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby, and shall be in a form  acceptable to Buyer and Buyer's counsel and shall contain, without limitation, (i) an order that the Purchased Assets are transferred and conveyed to the Buyer free and clear of all liens, claims, interests and encumbrances and that Buyer shall have no liability or successor liability with respect to any claims against the Seller or the Purchased Assets other than the Assumed Liabilities; (ii) findings that the Buyer is a good faith purchaser and entitled to the protections of section 363(m) of the Bankruptcy Code; and (iii)specific findings and orders that the sale of the Purchased Assets is free and clear of any and all of the use and/or  product sale restrictions contained in Section 6.03 of that certain Asset Purchase Agreement between Seller and Tembec USA LLC dated as of April 15, 2009.

(c) <u>Consents and Approvals</u>.   All consents, waivers, authorizations and approvals of third Persons as are necessary in connection with the transactions contemplated by this Agreement, including, without limitation, as necessary for the transfer of the Permits, the Licensed Intellectual Property Rights, the warranties and indemnification rights referenced in section 2.1(h) and the Insurance Policies, shall have been obtained, or Buyer shall be reasonably assured of obtaining such consents within a reasonable time, except for such consents, waivers, authorizations and approvals, the failure of which to obtain would not have a Material Adverse Effect and such consents and approvals which are not required due to the entry by the Bankruptcy Court of the Approval Order.

7.2. <u>Conditions Precedent to Obligations of Buyer</u>.In addition to the conditions set forth in section 7.1 hereof, the obligation of Buyer to close the transactions contemplated under this Agreement is subject to the reasonable satisfaction (or waiver by Buyer) at or prior to the Closing Date of each of the following additional conditions:

(a)    <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of Seller contained herein shall be true and correct in all material respects on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such date.

(b)    <u>Performance of Agreements</u>.  Seller shall have performed all obligations and agreements contained in this Agreement required to be performed by them prior to or at the Closing Date.

(c)    <u>Officer's Certificate</u>.  Buyer shall have received a certificate, dated as of the Closing Date, of an officer of Seller to the effect that the conditions specified in <u>Sections 7.2(a) and (b)</u> above have been fulfilled.

(d)    ~~Title and~~ <u>Title Insurance</u>.  ~~Seller shall convey the Immovable Property, including vehicular and pedestrian access thereto and all necessary and useful appurtenances and easements serving same, to Buyer at the Closing in fee simple with good and marketable and insurable title, free and clear of all liens and encumbrances except permitted exceptions ("Permitted Exceptions") which shall mean:  (i) all customary utility easements of record benefiting the Immovable Property and other easements, restrictions and covenants of record which do not in the sole opinion of Buyer and Buyer's counsel adversely affect the Buyer's intended use and development of the Immovable Property for the manufacture and sale of pulp and paper products; (ii) the effect of existing land use, zoning or governmental subdivision regulations so long as the Immovable Property are in material compliance therewith; and (iii) any lien for Taxes or assessments that are not yet due as of the date of the Closing or are due and payable, but not yet delinquent.  The term "insurable title" as used herein shall mean~~<u>Buyer shall be able to obtain title insurance satisfactory to Buyer and, without limitation, in the form of</u> ~~title evidenced by~~ a duly executed 2006 ALTA Commitment for an ALTA 2006 Owner's Policy and, if applicable, Lender's Policy from either Fidelity Title Insurance Company, Chicago Title Insurance Company or First American Title Insurance Company ~~to be provided by Seller~~ <u>and</u> providing insurance coverage in an amount equal to the agreed upon price for the Immovable Property with the premium at customary rates to be paid by Buyer, and otherwise disclosing and insuring title to the Immovable Property subject only to Permitted Exceptions.  <u>"Permitted Exceptions" shall mean:  (i) all customary utility easements of record benefiting the Immovable Property and other easements, restrictions and covenants of record which do not in the sole opinion of Buyer and Buyer's counsel adversely affect the Buyer's intended use and development of the Immovable Property for the manufacture and sale of pulp and paper products; (ii) the effect of existing land use, zoning or governmental subdivision regulations so long as the Immovable Property are in material compliance therewith; and (iii) any lien for Taxes or assessments that are not yet due as of the Closing Date.</u>~~In the event that Buyer notifies Seller in writing of title defects (which shall include any matters that would not qualify as Permitted Exceptions) prior to Closing, Seller shall have a reasonable period of time, not to exceed sixty (60) days, in which to remedy such title defects.  In the event that said defects cannot be corrected or remedied within said time period, then at Buyer's option, the Deposit shall be returned to Buyer and this Agreement will terminate or Buyer may elect to close notwithstanding~~

~~such defects and with no reduction in purchase price in which event such title defects shall be deemed Permitted Exceptions. Seller agrees to use reasonable, diligent efforts to cure any title defects. Seller further agrees any mortgages or liens on the Immovable Property shall not be Permitted Exceptions and shall be discharged by closing at Seller's expense.~~

(e)(d)  Buyer ~~, upon consultation with~~shall obtain from the relevant environmental regulatory authorities for the State of Louisiana, shall be reasonably assured ~~a letter or letters to the effect~~ that there are no known violations by Seller of state or federal Environmental Laws, no current investigations with respect to violations or threatened violations and no known Environmental Liabilities except to the extent previously disclosed by Seller in its virtual data room, confidential information memorandum or otherwise.

(f)(e)  Buyer shall have obtained, from transfer by the Seller or otherwise, or shall be reasonably assured of obtaining, all of the Permits that are required for the immediate operation of the Mill and the Business.

7.3.  Conditions Precedent to the Obligations of Seller.The obligation of Seller to close the transactions contemplated under this Agreement is subject to the satisfaction (or waiver by Seller) at or prior to the Closing Date of each of the following additional conditions:

(a)  Accuracy of Representations and Warranties.  The representations and warranties of Buyer contained herein shall be true and correct in all material respects on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representations or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such date.

(b)  Performance of Agreements.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or at the Closing Date.

(c)  Officer's Certificate.  Seller shall have received a certificate, dated as of the Closing Date, from an officer of Buyer to the effect that the conditions specified in Sections 7.3(a) and 7.3(b) above have been fulfilled.

ARTICLE VIII
TERMINATION

8.1  Termination of Agreement.This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a) By mutual written consent of Buyer and Seller;

(b) By either Buyer or Seller if the Closing shall not have occurred on or before April 30, 2010; provided, however, that, if the Closing has not occurred due to the failure of the Bankruptcy Court to enter the Approval Order or due to the existence of an unresolved objection to the Sale Motion and if all other conditions to the respective obligations of the parties to close hereunder that are capable of being fulfilled by May 31, 2010 have been so fulfilled or waived,

then neither party may terminate this Agreement prior to May 31, 2010; <u>provided</u>, <u>further</u>, <u>however</u>, that if the Closing has not occurred on or before any such date due to a breach of this Agreement by Buyer or Seller, the breaching party may not terminate this Agreement pursuant to this <u>Section 8.1(b)</u>;

          (c) By either Buyer or Seller, provided such party is not in breach of this Agreement, if there shall be any Law or regulation that makes the consummation of the transactions contemplated hereby illegal or otherwise prohibited or if consummation of the transactions contemplated hereby would violate any non-appealable final order, decree or judgment of any court or governmental body having competent jurisdiction;

          (d) By Buyer if Seller consummates a Competing Transaction, on the Business Day following the date of consummation of any Competing Transaction (unless Seller or Buyer shall previously have given notice of termination pursuant to this <u>Section 8.1</u>); or

          (e) By Seller, on the one hand, or Buyer, on the other, if Buyer or Seller, as the case may be, materially breach any of its obligations under this Agreement, unless such breach shall be cured within ten (10) Business Days after such other party shall have received written notice of such breach in accordance with the terms hereof;

          (f) By Buyer if, between the date of execution of this Agreement and the Closing Date, a material portion of the Purchased Assets are destroyed or damaged such that a Material Adverse Effect would result. Seller agrees that it shall provide prompt written notice in the event that any portion of the Purchased Assets are destroyed or damaged, Buyer and Seller also may agree to consummate the transaction contemplated hereby with respect to non-damaged Purchased Assets, upon the parties' agreement to a concomitant reduction in the Purchase Price.

          8.2     <u>No Liabilities in Event of Termination</u>.In the event of any termination of the Agreement pursuant to Section 8.1, written notice thereof shall forthwith be given to the other party specifying the provision hereof pursuant to which such termination is made, this Agreement shall forthwith become wholly void and of no further force and effect, and there shall be no liability on the part of Buyer or Seller, except that the obligations of Seller and Buyer under Sections 6.2 and 12.1 shall remain in full force and effect and except that if this Agreement shall be terminated pursuant to Section 8.1(e) hereof, the breaching party shall remain liable to the non-breaching party for costs, expenses and damages incurred by its breach, and in the case of a termination under Section 8.1(e) hereof upon the breach of the Buyer, the Deposit shall be returned to Buyer within three (3) Business Days of such termination.

ARTICLE IX
MINERAL RIGHTS

          9.1     <u>Mineral Rights</u>.

     If Seller owns any mineral rights they will be conveyed without any warranties whatsoever in the same manner as the Purchased Assets are being conveyed.

# ARTICLE X
# POSSESSION

10.1     Possession.

Possession of the Purchased Assets will be delivered to Buyer at the Closing.

# ARTICLE XI
# RISK OF LOSS

11.1     Risk of Loss.

Until the Closing, risk of loss to the Purchased Assets, ordinary wear and tear excepted, shall be upon Seller.  Immediately after the Closing, risk of loss to the Purchased Assets shall be solely upon Buyer.

# ARTICLE XII
# MISCELLANEOUS

12.1     Expenses.Except as set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each party shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the transactions contemplated hereby.

12.2     Assignment.Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Seller; provided, however, that Buyer may assign its rights and obligations hereunder, in whole or in part, to a nominee or nominees of Buyer, provided that no such assignment will relieve Buyer of its liabilities and obligations hereunder if such assignee does not perform such obligations and provided further, that this Agreement may be assigned to one or more trustees appointed by the Bankruptcy Court to succeed to the rights of Seller.

12.3     Parties in Interest.This Agreement is binding upon and inures solely to the benefit of Seller and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.  Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of Seller or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of Seller or Buyer, nor any director, officer, employee, representative, agent or other controlling person of each of the parties hereto and their respective Affiliates will have any liability or obligation arising under this Agreement or the transactions contemplated thereby.

12.4     Notices.Any and all notices or deliveries required to be given to another party to this Agreement shall be in writing and shall be delivered (i) in person, (ii) by a nationally recognized overnight carrier that guarantees next day delivery and provides a receipt, (iii) United States first class certified mail, return receipt requested, or (iv) by legible facsimile

with receipt confirmed (immediately followed by a hard copy in accordance with the preceding subparts (i), (iii) or (iii), and such notices shall be addressed to the addresses provided below. Any notice, request, demand or communication required or permitted to be delivered hereunder shall be deemed delivered when received. Rejection or other refusal to accept, or inability to deliver because of change of address of which proper notice was not given under this Agreement to the other party, shall be deemed to be receipt of the notice, request, demand or communication. Either party may change its address for notice from time to time by delivery of at least ten (10) calendar days prior written notice of such change to the other party hereto in the manner prescribed herein. If executed and delivered via facsimile, each party shall, immediately upon execution of this Agreement, send the other party a facsimile copy of a signed signature page (followed by a hard copy of the original signature page):

If to Seller:

> West Feliciana Acquisition, LLC
> 2105 LA Highway 964
> St. Francisville, Louisiana  70775
> Attention:  Allen F. Byrd
> Fax:  225-336-2894

With a duplicate copy (which shall not constitute notice to Seller) to:

> Gordon Arata McCollam Duplantis & Eagan LLP
> One American Place
> 301 Main Street
> Baton Rouge, Louisiana  70801-1916
> Attention:  Louis M. Phillips, Esq.
> Fax:  225-336-9763

If to Buyer:

> Stern Partners
> Suite 2900, P.O. Box 11583
> 650 West Georgia Street
> Vancouver, BC  V6B  4N8
> Attention: Shawn Lewis
> Fax:  (604)-681-8861

With a duplicate copy (which shall not constitute notice to Buyer) to:

> Bernstein Shur
> 100 Middle Street, P.O. Box 9729
> Portland, ME 04104-5029
> Attention:  Robert J. Keach
> Fax:  (207)-774-1127

12.5    Choice of Law.This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the Bankruptcy Code and the substantive laws of the State of Louisiana, in each case without regard to the conflict of law principles thereof or of any other jurisdiction.

12.6    Entire Agreement: Amendments and Waivers.This Agreement, as it may be supplemented and amended by the Approval Order, constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties.  Except as set forth herein or in any certificate delivered pursuant hereto, no party (or any employee or agent thereof) makes any representation or warranty, express or implied, to any other party with respect to this Agreement or the transactions contemplated hereby.  No supplement, modification or waiver of this Agreement (including, without limitation, any schedule hereto) shall be binding

unless the same is executed in writing by all parties. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

12.7 <u>Counterparts</u>.This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopy shall be as effective as delivery of a manually executed counterpart of this Agreement. In proving enforceability of this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

12.8 <u>Invalidity</u>.If any one or more of the provisions contained in this Agreement (other than any of the provisions contained in Article II or Article III hereof) or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the parties shall use their reasonable efforts, including, but not limited to, the amendment of this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the parties hereto on the date hereof.

12.9 <u>Headings</u>.The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

12.10 <u>Exclusive Jurisdiction</u>.Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.4 hereof.

12.11 <u>Waiver of Right to Trial by Jury</u>.Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

12.12 <u>Specific Performance</u>.Each of the parties hereto acknowledges that the other party hereto may be irreparably damaged in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached. Accordingly, each of the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to specifically enforce this Agreement and the terms and provisions thereof in any action instituted in the Bankruptcy Court or, only if the Bankruptcy Court shall determine that it does not have subject matter jurisdiction, in any court of the United States or any state thereof having subject matter jurisdiction, in addition to any other remedy to which the parties may be entitled, at law, in equity or pursuant to this Agreement.

12.13    Counting.If the due date for any action to be taken under this Agreement (including, without limitation, the delivery of notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

12.14    No Recording.

This Agreement shall not be recorded in the official records of West Feliciana Parish, Louisiana. In the event this Agreement is recorded in violation of this provision, it shall not be deemed to create or establish any right, title or interest affecting the Immovable Property, all of which are expressly waived and renounced by Buyer.  Should Buyer record this Agreement in the official records of West Feliciana Parish, Louisiana, Seller shall have the right, at it sole discretion, to immediately terminate this Agreement, and thereafter, the Parties hereto shall have no further rights or obligations to one another under this Agreement, except as otherwise provided in this Agreement.  If this Agreement is terminated pursuant to this Section 12.14, the Deposit shall become non-refundable and shall be forfeited to the Seller.  This section does not prohibit the post-Closing recordation of any documents made or entered into in connection with consummating the purchase and sale of the Purchased Assets.

12.15    No Third Party Beneficiaries.

There are no third party beneficiaries of this Agreement.  No provision of this agreement is intended or shall be construed to confer upon or to give any person other than the parties to this Agreement, any rights, basis for reliance, or remedies under or by reason of this Agreement, or to create a cause of action for enforcement thereof.

12.16    Opportunity to Consult Counsel, Voluntary Act.

Each party to this Agreement acknowledges that it has read this Agreement in its entirety, and has consulted such legal or other advisors as it deems appropriate and understands and agrees to each of the provisions of this Agreement and further acknowledge that it has voluntarily entered into this Agreement.

12.17    Attorneys' Fees.

If any action or proceeding is necessary to enforce any of the terms, provisions or conditions of this Agreement, including any claim or demand, or to interpret this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which it may otherwise be entitled, whether or not such action or proceeding is prosecuted to judgment.

12.18    Service of Process.Each party irrevocably consents to the service of process in any action or proceeding by receipt of mailed copies thereof by national courier service or registered United States mail, postage prepaid, return receipt requested, to its address as specified in or pursuant to Section 12.4 hereof.  However, the foregoing shall not limit the

right of a party to effect service of process on the other party by any other legally available method.

12.19   <u>No Personal Liability</u>.

Notwithstanding anything to the contrary contained herein, at law or in equity, no partner, officer, director, member, shareholder, affiliate or attorney of a party shall have any personal liability to the other party or any other person (a) under this Agreement, or (b) as a result of the execution and delivery of this Agreement, and the performance or nonperformance of a party's obligations under this Agreement, or (c) as a result of the sale of the Purchased Assets pursuant to this Agreement, or (d) as a result of a default under this Agreement, or the breach of any warranty, covenant, or representation contained in this Agreement, or (e) otherwise, except in each such cases to the extent required under Law. Notwithstanding anything to the contrary contained herein, the provisions of this Section 12.19 shall survive the Closing or the termination of this Agreement forever, and in the event of a conflict between any other provision of this Agreement and this Section 12.19, the provisions of this Section 12.19 shall prevail.

12.20   <u>Relationship of Parties</u>.

Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venture or any association between Seller and Buyer.

12.21   <u>Exhibits and Schedules</u>.The Exhibits and Schedules attached to, delivered with and identified to this Agreement are a part of this Agreement the same as if fully set forth herein and all references herein to any Section of this Agreement shall be deemed to include a reference to any Schedule named therein.

12.22   <u>Interpretation</u>.(a)      Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation.

(b)      Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)      A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(d)      A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)      All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(f)     All references to any financial or accounting terms shall be defined in accordance with GAAP.

12.24   <u>Preparation of this Agreement</u>.Buyer and Seller hereby acknowledge that (i) Buyer and Seller jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (ii) both Buyer and Seller have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (iii) no presumption shall be made that any provision of this Agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

**[End of Text]**

**[Two Signature Pages Follow]**

**SIGNED** by West Feliciana Acquisition, LLC, in its capacity as Debtor and Debtor-in-Possession at Baton Rouge, Louisiana, on the _____ day of _____, 2010, in the physical presence of me, Notary Public, and the following competent witnesses.

**Witnesses:**                                     **West Feliciana Acquisition, LLC,** in its capacity as
                                                   Debtor and Debtor-in-Possession


_____

_____          By: _____, duly authorized
Typed/Printed Name of Witness                          Allen F. Byrd
                                                   Its: CEO


_____

_____
Typed/Printed Name of Witness



_____
              Print Name _____
              Notary Public for _____
              Notary or Bar Id. No. _____
              Commission Expires _____

**SIGNED** by _Pacific West Commercial Corporation_____ at Vancouver, British Columbia, on the _____ day of _____, 2010, in the physical presence of me, Notary Public, and the following competent witnesses.

**Witnesses:**                                          _____

_____     By: _____ _____, duly authorized
                                                      _____
_____     Its: _____
Typed/Printed Name of Witness

_____

_____
Typed/Printed Name of Witness

_____
     Print Name _____
     Notary Public for _____
     Notary or Bar Id. No. _____
     Commission Expires _____

**List of Schedules**

Schedule 2.1(a) - Immovable Property
Schedule 2.1(c) - Assigned Executory Agreements
Schedule 2.1(d) - Licensed Intellectual Property Rights
Schedule 2.1(e) - Purchased Trademarks
Schedule 2.1(f) - Permits
Schedule 2.1 (j) - Insurance Policies
Schedule 2.2(h) - Excluded Agreements
Schedule 2.3      - Leased Property
Schedule 2.4      - Purchase Price Schedule
Schedule 2.7(c) - Cure Amounts

**Schedule 2.1(a)**

**Immovable Property**

A certain tract of land, being Tract 2 located in Sections 47, 48 & 49, T4S-R2W, G.L.D., West Feliciana Parish, Louisiana, and being more particularly described as follows: Starting at the northwest corner of Tract 1 also being the POINT OF BEGINNING; thence proceed South 40 degrees 01 minutes 53 seconds West, a distance of 25.11 feet; thence South 22 degrees 54 minutes 57 seconds West, a distance of 150.45 feet; thence South 69 degrees 52 minutes 50 seconds West, a distance of 2207.69 feet; thence North 07 degrees 02 minutes 14 seconds West, a distance of 113.62 feet; thence North 02 degrees 41 minutes 35 seconds West, a distance of 235.62 feet; thence North 01 degrees 24 minutes 08 seconds East, a distance of 178.31 feet; thence North 01 degrees 24 minutes 51 seconds West, a distance of 247.95 feet; thence North 08 degrees 10 minutes 32 seconds West, a distance of 417.05 feet; thence North 06 degrees 47 minutes 14 seconds West, a distance of 251.32 feet; thence North 03 degrees 50 minutes 59 seconds West, a distance of 421.45 feet; thence North 07 degrees 00 minutes 02 seconds West, a distance of 878.64 feet; thence North 05 degrees 44 minutes 07 seconds West, a distance of 391.30 feet; thence North 73 degrees 55 minutes 41 seconds East, a distance of 3914.74 feet; thence South 82 degrees 00 minutes 10 seconds East, a distance of l351.28 feet; thence North 43 degrees 16 minutes 53 seconds East, a distance of 33.40 feet; thence North 29 degrees 14 minutes 16 seconds West, a distance of 254.80 feet; thence North 40 degrees 56 minutes 04 seconds West, a distance of 102.70 feet; thence North 19 degrees 26 minutes 28 seconds West, a distance of 199.50 feet; thence North 37 degrees 30 minutes 35 seconds West, a distance of 222.05 feet; thence North 83 degrees 06 minutes 19 seconds East, a distance of 998.47 feet; thence North 87 degrees 54 minutes 00 seconds East, a distance of 2617.72 feet; thence South 00 degrees 01 minutes 02 seconds East, a distance of 1275.53 feet; thence South 73 degrees 57 minutes 32 seconds East, a distance of 770.00 feet; thence South 61 degrees 12 minutes 31 seconds East, a distance of l34.06 feet; thence South 17 degrees 12 minutes 45 seconds East, a distance of 707.91 feet; thence South 26 degrees 49 minutes 49 seconds East, a distance of 393.52 feet; thence South 15 degrees 31 minutes 37 seconds East, a distance of 92.31 feet; thence South 24 degrees 55 minutes 01 seconds West, a distance of 231.29 feet; thence South 59 degrees 59 minutes 03 seconds West, a distance of 330.63 feet; thence South 58 degrees 06 minutes 12 seconds West, a distance of 248.l3 feet; thence North 85 degrees 13 minutes 10 seconds West, a distance of 322.36 feet; thence South 68 degrees 42 minutes 27 seconds West, a distance of 878.80 feet; thence North 78 degrees 55 minutes 45 seconds West, a distance of 1040.61 feet; thence South 86 degrees 17 minutes 26 seconds West, a distance of 1455.50 feet; thence North 15 degrees 10 minutes 47 seconds West, a distance of 101.16 feet; thence North 18 degrees 33 minutes 46 seconds West, a distance of 345.73 feet; thence South 69 degrees 11 minutes 54 seconds West, a distance of 630.02 feet; thence South 69 degrees 27 minutes 55 seconds West, a distance of 1759.81 feet; thence South 69 degrees 07 minutes 42 seconds West, a distance of 627.96 feet to the POINT OF BEGINNING. All according to map entitled "Map Showing Resubdivision of The St. Francisville Paper Company Property ... ", dated 8/4/08, Job Number A080235, by Alvin Fairburn and Associates, LLC.

Together with all servitudes, easements, rights of way and appurtanances benefiting the Property including but not limited to those rights set forth in that act entitled "Grant of Reciprocal Servitudes" recorded in the office of the Clerk of Court of West Feliciana Parish as file number 99380, Conveyance Book 171 Page 319.

**Schedule 2.1(c)**

**Assigned Executory Agreements**

1. Agreement And Amendment To Gloster Amended And Restated Log Processing Agreement Dated December 31, 2009

2. Amended And Restated Log Processing Agreement Between Gloster And Crown Vantage Dated July 1, 1996

3. Sublease Agreement Between Gloster And Crown Vantage Dated June 30,1997,

4. Extension Of Agreement For Transportation Of Forest Products Dated May 1, 2004

5. Agreement For Transportation Of Forest Products Dated May 1, 2000, (The "Original Agreement") By And Between Crown Paper Company D/B/A Crown Vantage, Which Has Been Replaced By Tembec Inc. (The "Shipper") And Gloster Chips, Inc.

6. Amended And Restated Ground Lease, Dated April 16, 1997 And Notice Of Extension Dated 7/21/2008

7. First Amendment To Petroleum Coke Purchase And Sale Agreement Entered Into As Of December, 2009

8. Petroleum Coke Purchase And Sale Agreement Dated The 5th Day Of January, 2007

9. Cooperative Endeavor Agreement By And Between Louisiana Department Of Economic Development And West Feliciana Acquisition, LLC  Dated April        , 2009 and Effective Date April 6, 2009

10. Crude Tall Oil And Black Liquor Soap Skimmings Agreement Made And Entered Into As Of The 1" Day Of January 2010, By And Between West Feliciana Acquisition, LLC, A Delaware Corporation ("Seller") And Meadwestvaco Corporation

11. State Of Louisiana River Access, Water Bottom Lease, so-called.

**Schedule 2.1(d)**

**Licensed Intellectual Property Rights**

Software licenses are grouped below by class: Operating Systems, Business Application Software, and other software including client and server based software.

**Operating Systems:**

| | | |
|---|---|---|
| NT Licenses | 206 | No longer is use. |
| 95 Licenses | 43 | |
| 98 Licenses | 3 | |
| Win2k Licenses | 88 | Currently in Use |
| WinCE Licenses (Thin Clients) | 64 | |
| Win XP Tablet Licenses (tablets) | 6 | |
| WinXP Licenses | 192 | |
| Win Vista | 1 | |
| Total | 603 | |

**Business Applications Software:**

| Company | Product |
|---|---|
| Honeywell | OptiVISION v500 |
| Baywood | Wood Procurement |
| Baywood | ScaleHouse |
| Capstone Technologies | Parcview / Mole |
| Numara | Track-IT |

| Software | License Count |
|---|---|
| MS Office 2003 | 96 |
| MS Project 2003 | 11 |
| MS Visio 2003 Pro/Stan. | 1 |
| Windows 2003 Server CALS | 250 |
| MS Exchange 2003 CALS | 50 |
| Windows 2003Term Service CALS | 60 |
| MS SQL 2000 CALS | 305 |
| Windows 2003 Server | 4 |
| Windows 2003 Server R2 | 2 |
| Windows 2003 Ent Server | 2 |
| Windows 2003 Ent Server R2 | 2 |
| MS Exchange 2003 | 1 |

| Software | License Count |
|---|---:|
| MS SQL 2000 | 8 |
| MS SQL 2000 ENT | 0 |
| Windows NT Server 4.0 | 25 |
| Windows NT Terminal Server Ed | 3 |
| Windows 2000 Server | 15 |
| Windows 2000 Advanced Server | 2 |
| Windows NT Server 4.0 ENT | 4 |
| Windows NT Server CALS | 175 |
| Windows 2000 Server CALS | 190 |
| WindowsNT Term Serv CALS | 17 |
| Windows 2000Term Service CALS | 5 |
| MS SQL 6.5 | 2 |
| MS SQL 7.0 | 3 |
| MS SQL 7.0 ENT | 1 |
| SQL 7.0 CALS | 45 |
| MS SMS 1.2/2.0 | 2 |
| MS SMS 2003 CALS | 50 |
| MS SMS 2.0 CALS | 390 |
| MS Exchange 5.5 Ent | 1 |
| MS Exchange 5.5 | 1 |
| MS Exchange 2000 CALS | 270 |
| MS Office 97 | 113 |
| MS Office 2000 | 7 |
| MS Office XP | 170 |
| MS Project 98 | 46 |
| MS Project 2000 | 22 |
| MS Project 2002 | 3 |
| MS Visio 2000-02 | 11 |
| MS Windows XP Pro. | 4 |
| MS Visual Basic 5.0/6.0 | 15 |
| MS Visual Studio .NET | 2 |
| MS Visual Source Safe | 6 |
| WRQ Reflections StandAlone | 83 |
| WRQ Reflections for the Web | 30 |
| Adobe Writer 3.0 | 3 |
| Adobe Writer 4/5/6/7 | 21 |
| Adobe Page Maker 7.0 | 1 |

| Software | License Count |
|---|---|
| Symantec pcAnywhere | 56 |
| Symantec pcAnywhere 10/10.5 | 49 |
| Citrix Meteframe 1.8 | 5 |
| Citrix CALS | 75 |
| Citrix XP CALS | 90 |
| AutoCAD 2000i | 13 |
| AutoCAD 2005 Mech | 13 |
| Seagate Info CALS | 75 |
| Seagate Info 8.5 | 1 |
| Oracle 8 | 1 |
| Oracle 8 CALS | 10 |
| Exceed | 68 |
| WinZip | 105 |
| Org Plus 3.5 | 1 |
| Tracki-IT Ent. | 13 |
| Omtool FaxSr 3.2 | 1 |
| Xlink Omni-Print | 2 |
| DBArtison 8.1 | 3 |

**Schedule 2.1(e)**

**Purchased Trademarks**

Acadian

Crown Kraft

Crownline

Crown Vantage

Delta Brite

Echo

Kleerglaze

Monterey

Orleans

Surfa

**Schedule 2.1(f)**

**Permits**

**Air Operating Permit** – Part 70 Operating Permit No. 3160-00001-V3, issued November 27, 2007 to Tembec USA, LLC by the State of Louisiana Department of Environmental Quality. Permit expires on November 27, 2012.

The mill is currently operating under an Administrative Order on Consent (MM-AO-09-0076) which allows Nos. 1 & 2 paper machines to produce unbleached linerboard and bag. As required by the administrative order, West Feliciana Acquisition has submitted an air permit modification application to the Louisiana Department of Environmental Quality. The application not only includes linerboard and bag but also has the flexibility to produce bleached products on Nos. 1, 2, 3, & 4 paper machines.

**LPDES Permit Renewal** – West Feliciana, LLC operates under LPDES Permit No. LA003468, to Discharge Industrial Wastewater. The permit was issued by State of Louisiana Department of Environmental Quality effective November 1, 2009 and expires November 1, 2014. A permit modification has been submitted to operate paper machine No. 4 on purchased bleached or internally bleached pulp.

**Solid Waste Permit** – Permit Number P-0013/GD-125-0732 issued by the State of Louisiana Department of Natural Resources, Office of Environmental Affairs, Solid Waste Management Division to Crown Zellerbach Corporation on August 26, 1982. The original permit has been successfully transferred to successive owners since then including West Feliciana Acquisition LLC.

The solid waste permit expired December 31, 2007; but the Louisiana Department of Environmental Quality (LDEQ) provided an extension for the filing of a renewal application. The renewal application was submitted to the LDEQ on April 2, 2008. A letter was received from LDEQ on March 30, 2009 stating it had completed its review of the renewal application. The letter provided comments on the application and requested additional information and clarifications to have the application in conformity with the applicable sections of the Louisiana Solid Waste Regulations LAC 33:VII. The permit remains in full force and effect during the renewal application process.

**Radioactive Material License** – License Number LA-12166-L01, expiration date June 30, 2014. The license is to possess and operate up to eight Kr 85 sources and an aggregate of 5 Curies of Cs 137 sources. Certifications for two analytical x-ray units that are non-licensed nuclear sources have been retained and maintained.

**EPA Hazardous Waste (RCRA) Identification Number LAD041321431 –** The mill is considered a Small Quantity Generator Conditionally Exempt.

**Schedule 2.1(j)**

**Insurance Policies**

| Coverage | Effective Dates | Insurer | Policy Number | Limits | |
|---|---|---|---|---|---|
| **Workers' Compensation** | 04/15/09 to 04/15/10 | Hartford Casualty Ins. Co. | 84 WBIQ0727 | Statutory | Workers Compensation |
| | | | | $ 1,000,000 | BI by Accident - Each Accident |
| | | | | $ 1,000,000 | BI by Disease - Each Employee |
| | | | | $ 1,000,000 | BI by Disease - Policy Limit |
| | | | | | |
| **Automobile** | 04/15/09 to 04/15/10 | Hartford Casualty Ins. Co. | 84 UENNY4756 | $ 1,000,000 | Liability Coverage - Symbol 7, 8, 9 |
| | | | | $ 1,000,000 | UM/UIM - Symbol 7 |
| | | | | $ 5,000 | Medical Payments - Symbol 7 |
| | | | | $ 500 | Comprehensive Deductible - Symbol 7 |
| | | | | $ 500 | Collision Deductible - Symbol 7 |
| | | | | | |
| **General Liability** | 04/15/09 to 04/15/10 | Hartford Casualty Ins. Co. | 84UENNY4756 | $ 1,000,000 | Each Occurrence |
| | | | | $ 2,000,000 | General Aggregate |
| | | | | $ 2,000,000 | Products Aggregate |
| | | | | $ 1,000,000 | Personal & Advertising |
| | | | | $ 300,000 | Fire Damage |
| | | | | $ 10,000 | Medical Expense |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Umbrella** | 04/15/09 to 04/15/10 | Hartford Casualty Ins. Co. | 84 RHUNY3660 | $ 10,000,000 | General Aggregate |
| | | | | $ 1,000,000 | Products-Completed Operations Aggregate |
| | | | | $ 10,000,000 | Bodily Injury by Disease Aggregate |
| | | | | $ 10,000,000 | Each Occurrence |
| | | | | $ 10,000 | Self Insured Retention |
| | | | | | |
| **Property/Boiler & Machinery** | 04/15/09 to 04/15/10 | FM Global | XG716 | $ 700,000,000 | Maximum Limit of Liability Per Occurrence |
| | | | | $ 10,000,000 | Miscellaneous Unnamed Locations per Location |
| | | | | $ 100,000,000 | Accounts Receivable |
| | | | | $ 100,000,000 | Valuable Papers & Records |
| | | | | $ 100,000,000 | Automatic Coverage (for 90 days) |
| | | | | $ 100,000,000 | Errors and Omissions |
| | | | | $ 100,000,000 | Expediting Costs |
| | | | | $ 100,000,000 | Fine Art |
| | | | | $ 10,000,000 | Data, Programs or Software and Computer |
| | | | | $ 10,000,000 | Miscellaneous Personal Property per Location |
| | | | | $ 10,000,000 | Off Premises Storage For Property under Construction |
| | | | | $ 25,000,000 | Service Interruption Property Damage |
| | | | | $ 25,000,000 | Contingent Time Element |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Excluded | Turbine Generator Time Element |
| | | | | $ 10,000,000 | Transportation (NTE $1mm for TE) |
| | | | | $ 15,000,000 | Operational Testing |
| | | | | $ 100,000,000 | Earth Movement in the Aggregate any Policy Yr. |
| | | | | $ 100,000,000 | Flood |
| | | | | | Deductible |
| | | | | $1,000,000 | Property Damage |
| | | | | $2,000,000 | Time Element |
| | | | | $1,000,000 | Chemical Recovery Boiler Property Damage |
| | | | | $4,000,000 | Chemical Recovery Boiler Time Element |
| | | | | $5,000,000 | Turbine Generator Property Damage |
| | | | | $1,000,000 | Operational Testing Property Damage |
| | | | | $4,000,000 | Operational Testing Time Element |
| | | | | $5,000,000 | Flood |
| | | | | $5,000,000 | Wind |
| | | | | $15,000,000 | Named Windstorms |
| | | | | | |
| **Pollution** | | Illinois Union Insurance Co. | PPLG2488157A001 | $ 20,000,000 | Per "Pollution Condition" |
| | 04/15/09 to 04/15/14 | (New Conditions) | | $ 20,000,000 | Aggregate All "Pollution Conditions" |
| | 04/15/09 to | (Pre-existing | | $ 250,000 | Retention Amount, per "Pollution Condition" |

| | | | | | |
|---|---|---|---|---|---|
| | 04/14/19 | Conditions) | | | |
| | | | | | |
| | | | | | |
| **Executive Risk** | 04/15/09 to 04/15/10 | Travelers Casualty & Surety | 105270560 | $ 3,000,000 | Directors & Officers |
| | | | | $ 3,000,000 | Employment Practices Liability |
| | | | | $ 1,000,000 | Crime |
| | | | | | |
| | | | | | **Retentions:** |
| | | | | $ 10,000 | D & O |
| | | | | $ 10,000 | EPL |
| | | | | $ 2,500 | Crime |
| | | | | | |
| **Foreign Liability** | 07/22/09 to 04/15/10 | Ace | PHFD37501931 | | **General Liability:** |
| | | | | $ 1,000,000 | Each Occurrence |
| | | | | $ 2,000,000 | Aggregate Limit - Products/Completed Operations |
| | | | | $ 1,000,000 | Premises Damage Limit |
| | | | | $ 1,000,000 | Personal & Advertising Injury |
| | | | | $ 10,000 | Medical Expense |
| | | | | $ 1,000,000 | Employee Benefits Liability |
| | | | | | |
| | | | | | **Contingent Auto Liability** |
| | | | | $ 1,000,000 | Combined Single Limit - Owned, Hired and Non-Owned |
| | | | | $ 25,000 | Hired Auto Physical Damage - Any one accident |

| | | | | $ | 25,000 | Hired Auto Physical Damage - Any one policy period |
|---|---|---|---|---|---|---|
| | | | | $ | 10,000 | Medical Payments - each person |
| | | | | $ | 10,000 | Medical Payments - each accident |
| | | | | | | |
| | | | | | | **Employers Responsibility** |
| | | | | $ | 1,000,000 | Bodily Injury by Accident - each accident |
| | | | | $ | 1,000,000 | Bodily Injury by Disease - each employee |
| | | | | $ | 1,000,000 | Bodily Injury by Disease - policy limit |
| | | | | $ | 1,000,000 | Executive Assistance Services |
| | | | | | | |
| | | | | | | |
| Note:  Premiums shown do not include applicable taxes, assessments, fees or surcharges. | | | | | | |

**Schedule 2.2(h)**

**Excluded Executory Agreements**

# Schedule 2.3

## Leased Property

| Equipment | Location | Lessor/Owner |
|---|---|---|
| Office portable building and contents | Contractor site | Johnson Controls |
| 30 yard trash dumpster | Pulp slab | Allied Waste |
| Propane Tank | Mill Services | Harrell Gas |
| (6) Fuel tanks & pumps | Millwide | Russell Daniel |
| (Approx. 20) 400 gal. oil storage tote tanks | Millwide | Russell Daniel |

**Renew Paper Company / On Site Ashland Hercules Leased Equipment**

**#1 & #2 Paper Machines**

| Application | Product | Equipment Description |
|---|---|---|
| Paper Machine Defoamer | Advantage NF2130 | 2 Dual head A&F piston pumps; 2 single head A&F piston Pumps with Electrical Control Panel |
| Paper Machine Pitch Control | Detac DC 7225 | SS Skid with 4 Seepex positive displacement pumps with 90 VAC DC motors 3 Yokogawa Mag Flow meters, SS piping with post water dilution; electrical control panel and Automatic remote control capability. Job # *9/13/96* |
| PM Saveall (DAF) Flocculent | Perform PC 8138 | 1 Berkshire polymer makedown system with day tank;1 neat seepex polymer feed pumps with DC drive motors with controllers; 2 made down polymer feed pumps 3 Yokagawa Mag flow meters; post dilution. 1 make down tank agitatator and 440VAC electrical panel with transformers and PID controllers |
| PM Stock & Broke Biocide | Spectrum RX8050 | 2 plastic feed cabinets with 4 LMI diaphragm metering pumps C111 models |
| Paper Machine Wet Felt Continuous Felt condition | Prestige FC 8580 | 2  SS skids; each with 3 Milton Roy diaphragm pumps with DC motors and controllers; each with 3 Yokogawa mag flow meters and 3 each manual drawdown assemblies. Each with electrical control panels and DC controllers. #1 PM skid Asset # 1999-360; #2 PM skid Asset # 1999-358 |
| Internal Rosin Size | Ultraphase | Black Plastic feed skid with 3 Sigma 2 Prominent pumps with AC motors and electrical controls; @ each Yokogawa mag flow meters and 3 manual drawdown assemblies; Asset #2004 22F |
| Back up Size feed Skid | Ultraphase | SS skid with 2 Prominent pumps with DC motors and controllers with electrical panel one Yokogawa mag flow meter. Asset #1613 |
| #2 PM Batch Wash system | Prestige FB 9050 | One SS skid with four 10 GPM pumps with 1 hp AC motors. One 440VAC control panel and control valves. Asset # 2335 |
| #1 & 2 PM Strength application | Hercobond 6350 | 3 each small SS feed skids each with one 2 GPM Roper gear pump stand 90 VDC motor with Minarak controller and post dilution |
| Debonder skid for #1 PM | Prosoft | 1 Roper Roc 5  5 GPM pump with 1/2 Hp AC motor and controller and electrical panel |

**Testing Instrumentation and Equipment**

| Application | Equipment | Equipment Description |
|---|---|---|

| #1 &2 PM Charge Demand Analyzer | Charge Demand Analyzer | One Mutek PCD 02 Charge Analyzer SN#100-51-925 |
| Conductivity Measurement | Conductivity Analyzer | Oakton Conductivity Kit # Do413438; Meter #179787 |
| Chemistry testing on PMs | Clorimeter | Hach DR/2000 portable Colorimeter SN # 900609881 |

## Water/Wastewater & Pulp Mill Equipment

| Application | Equipment | Description |
|---|---|---|
| DEHA SPR | LMI Pump | SN 011013453 Small Diaphragm metering pump |
| N | LMI Pump | SN 960822384 Small Diaphragm metering pump |
| Boiler Treatment Optisperse 54678 | LMI Pump | 2 pumps SN 01712504 & 010814606 |
| SPR Caustic | LMI Pump | SN 20021016519 |
| Pumps protection | Pump Cabinets | 4 White plastic Pump cabinets with lexan doors and feed ports |
| Chemical storage tanks | 30 gallon chemical tanks | Two yellow Poly 30 gallon drums |
| Evap Defoamer | A&F Dual head | 1/4" head Dual head A & F piston pumps with 100 VAC drive motors |
| Evap Defoamer | Air Pump recirc pack | 1 1/2" air diaphragm recirc pump; Plastic body |
| Groslin Timer SPR | Groslin Timer | SN 1504-C One |
| Evaporator defoamer | Dual Head A & F Pump | 2 each dual head A & F pumps with 110VAC motors & 1/2" heads |
| Weak wash anti scale | LMI Pump | SN 950401497 small diaphragm metering pump |
| Evaporator Defoamer | 1 1/2" Diaphragm Pump | Recirculation package |
| Evaporator antiscale | 2 dual head A&F pumps | Piston pumps with 1/2' dual heads and 110vac motors |
| DEHA SPR | Plastic pump cabinet | 2 dual pump plastic pump cabinets |
| SPR Boiler Chemicals | sight glass | 4 metal clad sight glasses for feed bins |
| SPR Boiler Chemicals | Bin Manifolds | 4 SS 5 port x 1 1/2' cam lock bin manifolds |
| Green & White liquor flocculent | EM15 | self contained polymer makedown system with day tank , agitator, 1 Roper neat poly feed pump 2 roper made down feed pumps, 3 Yokogawa flow meters and control electronics |
| Soap separation aid | LMI Pump feed package | plastic pump cabinet(9F6-2549) ,SS bin manifold; sight glass; LMI 991110877 |
| Secondary rejects screen defoamer | LMI Pump feed package | plastic pump cabinet(9F6-2549) ,SS bin manifold; sight glass; LMI 84071110 |
| Pulp mill defoamer tank | 10,800 gallon HD Poly bulk tank | Poly Processing tank # L-09-02338 with fill lines and manifolds |
| Pulp Mill Defoamer | A&F Dual head | Dual head A&F Piston pump with 1/2" heads and 110 vac motor |
| Draw down assemblies | Kenco Plastic Drawdown tubes | 8 (eight) 250 ml drawdown cylinders |
| Evaporator defoamer | Strainers & Drawdown assemblies | one dual filter/strainer 2" with drawdown tubes |

| Influent water oxidizer | Hypochlorite (bleach) feed skid | One feed skid w/ 2 Prominent diaphragm feed pumps with motors & controllers and drawdown assemblies Asset # 2007-240 |
|---|---|---|
| Influent water oxidizer | Hypochlorite (bleach) feed skid | One feed skid w/ 2 Prominent diaphragm feed pumps with motors & controllers and drawdown assemblies Asset # 2007-239 |
| Influent water flocculent | one SS feed skid | SS skid with two seepex pumps; 2 90 volt DC motors and PDI controllers;Yokogama flow meter & SS static mixer # 1999-357 |
| Sludge press flocculent | Polymer makedown system with feed pumps | One feed system assembled locally from spare parts- contains 150 gal makedown tank, level controls, neat A&F polymer pump;2 made down polymer feed pumps(Ropers) w DC motors and drive controllers. All mounted on steel frame painted black. |
| Effluent (river) defoamer | dual pump feed skid | Two A&F piston pumps with motors and controllers and drawdown assemblies. One pump mounted with timed restart cabinet 2001-239 |
| Effluent (river) defoamer | Recirculation package | one 2" progressive cavity pump with in line strainer, 100vac drive motor and control panel |

### Misc. Equipment & Supplies stored in North Side warehouse and in Ashland Hercules storage shed

| Application | Type of Equipment | Equipment Description |
|---|---|---|
| Flocculent make down | Polymer Makedown Unit | Old refurbished flocculent make down unit-has neat seepex poly feed pump w/dc motor & drive one madedown feed pump yokogawa flow meter electrical controls and level controller al skid mounted |
| feed of neat chemicals | Chemical feed skid | SS skid with 2 seepex pumps w/ DC drives, control panel and Yokogawa flow meter |
| feed of neat chemicals | Chemical feed skid | SS skid w/3 seepex pumps w/ DC drives, control panel & Yokogawa flow meters |
| feed of neat chemicals | Chemical feed skid | Old SS skid with roper gear pumps and Dc controller |
| Straining/filtering of feed chemicals | Bag filter Assembly | SS bag filter assembly with dual tanks mounted together |
| Small feed pump housings | Feed cabinets | 5 each plastic(white) feed cabinets with clear lexan doors and electrical outlets |
| Size skid | Chemical feed skid | Roper RC3 pump with 1/2 HP Ac motor & Ac controller & Drawdown assembly |
| Transfer of neat chemicals | Chemical transfer pumps | SS skid w/ Dual 3' Yamada air diaphragm pumps SN#s 422706 & 422703 Hercules asset #2007-075 |
| To mount chemical feed systems | SS skid frame | 6' x 4' STT square tube skid for mounting various feed equipment- no equipment mounted |
| To pipe various feed skids | PVC Pipe | 8  six ft pieces of Sch 80 PVC 3/4" in bundle |
| to move equipment | Wheel cart | 24" x48" wooden platform; 4 wheel cart with push handle |
| to measure drawdown rate and chemical levels in bins | Bin Drawdown/sight glasses | 4' x 2" metal clad , calibrated sight/drawdown assemblies |
| Freeze protection | Equipment heaters | 8 small 110 vac ceramic heaters for freeze protection of equipment |
| Freeze protection | Plastic Tarps | 8 various sized plastic tarps to cover equipment during very cold weather |
| to apply chemicals | Chemical sprayers | 2 each "backpack" pump up plastic sprayers for application of chemicals on surfaces |

| Purpose | Item | Description |
|---|---|---|
| Measurement of fluid flows | Yokogawa Flow meters | 4 each model # AE115MG;4 each model AE105MG |
| feed of neat chemicals | Chemical feed skid | SS skid with 2 Yokogawa flow meters (AE105MG) and 2 controllers- no pumps or motors |
| Labeling of bulk tanks | Tank Placards | 8 new tank placards in box |
| feed of neat chemicals | SS skid frame | 5' x 4' SS skid with Yokogawa flow meter (AE102MG) and controller-No pumps or motors |
| To control DC drives and turn equipment off & on | Controller Boxes | 20 reliance control boxes/ to control off/on and manual/auto on equipment |
| To allow safe stacking of S3 bins | Stacking Pads | 18 each of these yellow steel stacking pads |
| to generate ClO2 gas | ClO2 Generators | 2 small very old generators-SN#s 5354 & 5287 |
| ATM motors | Small motors | 1/4 hp motors to mount on prominent diaphragm pumps 2 each |
| to automatically makedown and control level of made down paper machine & DAF flocculent | PM Flocculent makedown system | One EM 40 poly make down system- 2 neat poly feed pumps(Roper Roc3 & Milton Roy dual head); water filter unit; complete control 440/220 VAC control panel; 5 HP water booster motor/pump; chemical mix motor/pump; Micromoton Mass Flow meter; Yokogawa flow meter Asset #199014 / CO6-990224-01 |
| to automatically makedown and control level of made down paper machine & DAF flocculent | PM Flocculent makedown system | One EM 40 poly make down system- 2 neat poly feed pumps(Roper Roc3 & Milton Roy dual head); water filter unit; complete control 440/220 VAC control panel; 5 HP water booster motor/pump; chemical mix motor/pump; Micromoton Mass Flow meter; Yokogawa flow meter Asset # J9083 / CO6-990310-01 |
| feed of neat chemicals | Gear pumps | 2 each Roc 3 pumps no motors- old rebuilt pumps no #s |
| To plumb feed equipment | SS, Plastic and mild steel fittings | Various fittings ranging from 3/8" to 2" used to plumb all chemical applications |
| To plumb feed equipment | Plastic feed tubing | 3/8";1/2";3/4";1 1/2" plastic tubing used for chemical feed applications 50' to 200' of each |
| | 2001-087 | filter housing |
| | 1998-045 | hypo feed skid for 4pm |
| | 1998-046 | hypo feed skid for 4pm |
| | 1996-291 | hypo feed skid for 4pm |
| | 1999-015 | old defoamer feed skid |
| | 1999-016 | old pitch dispersant feed skid |
| | 1997-033 | old polymer feed skid |
| | 1999-014 | old feed skid seepex duplex |
| | 1999-013 | old feed  skid for wire wash |
| | 1999-063 | 1&2 retention aid storage tank 8000 gal. |

| Asset Description | Project No. |
|---|---|
| Analyzer, On-Line Electrokinetic Charge Analyzer | 2002-162 |
| Berkshire 150 with (2)Roc-01 feed pumps (w/ 0.2" Yokogawa AdMag and AXF).  Has PID ratio control for neat poly and 10 gpm post dilution with rotometer. | 1998-283 |

| | |
|---|---|
| Berkshire 275 w/2 Liquiflo Max4 feed  pumps (PID control, AXF mag meters, 480 Volts) | 1999-109 |
| Camera, Fixed view outdoor camera with relay server S/W & wireless | 2003-20-050 |
| CAMView Industrial Camera | 2002-192 |
| Filter, BFN-12 Filter Housing | 2001-087 |
| Jet Mem, S/N 889, SE872 | 1900-194 |
| LeakTrac WMB Computer Workstation | 2009-045 |
| Polymer System, High Viscosity Solution Polymer, direct feed | 1998-119 |
| Pump Skid, BOTF Felt Conditioning Skid, #1PM | 1996-088a |
| Pump Skid, Duplex A&F.  (1) Cont. (DC drive) & (1) batch (AC & reset timer) - A&F 1230 | 2001-239 |
| Pump Skid, Duplex Neptune, Two position biocide (Neptune Kynar?) | 1999-019 |
| Pump Skid, Duplex Neptune, Two position pump skid (Neptune Kynar?) | 1999-012 |
| Pump skid, Duplex Prominent with mag meter and drawdown. | 1900-039 |
| Pump Skid, Duplex ProMinent, 350 lph (93 gph) and 35 lph pumps  (9.3 gph), 120VAC | 2007-240 |
| Pump Skid, Duplex ProMinent, 350 lph (93 gph), 120VAC | 2007-239 |
| Pump skid, Duplex RX94/Hypo Feed Skid w/ORP | 1998-045 |
| Pump skid, Duplex RX94/Hypo Feed Skid w/ORP | 1998-046 |
| Pump skid, Duplex RX94/Hypo Feed System | 1996-291 |
| Pump Skid, Duplex Seepex defoamer skid - Seepex | 1999-015 |
| Pump Skid, Duplex Seepex pitch dispersant skid - Seepex | 1999-016 |
| Pump Skid, Duplex Seepex Polymer Pump Skid | 1997-033 |
| Pump skid, Duplex Seepex pump skid w/ Yokogawa mag flow meter, (2) DC3NFG/PID panels. (SS internals, Viton Stators) (Seepex 00005-12 pumps  - 200 cc/min @ 150 psi, SSpiping | 1999-357 |
| Pump Skid, Duplex Seepex w/ Mass Meters | 1999-014 |
| Pump Skid, Five Seepex pump skid - wire treatment | 1999-013 |
| Pump Skid, Quad Milton Roy pump skid, 3 feedpoints/spare, 2 pumps at 5.7gph@350psi, 2 pumps at 3.5gph@350psi,w/ DC Motors, 3 mags 0.2", L-O-R | 1999-360 |
| Pump Skid, Quad MTH with 4 Signet flow meters;  Batch F/C Skid | 1996-073 |

| | |
|---|---|
| Pump Skid, Quad Seepex w/ water dilution (3) feedpoints w/ AXF mags, (No PID); MD003-12, 0.2 GPM or 800 cc/min, SSpiping (120VAC) | 2000-073 |
| Pump skid, Single Liquiflo, Mach-4 pump, (M0 pump - 0.5gpm), with 0.2" Yokogawa Mag flow meter and PDA. (120 VAC) | 2008-154 |
| Pump skid, Single Liquiflo, Mach-4 pump, (M1 pump - 1.0 gpm), with 0.2" Yokogawa Mag flow meter and PDA. (120 VAC) | 2008-148 |
| Pump skid, Single Liquiflo, Mach-4 pump, (M1 pump - 1.0 gpm), with 0.2" Yokogawa Mag flow meter and PDA. (120 VAC) | 2008-155 |
| Pump Skid, Triple Milton Roy pump skid, RA11105SREM1NN 6.2 gph @100 psi, 5.7 gph @350 psi with w/ DC Motors, 3 mags 0.2", L-O-R | 1999-358 |
| Pump Skid, Triple ProMinent (69.7 gph) with 0-10 gpm post dilution (field modified to include 2 mag meters on site) | 2004-227 |
| Recirculation Package, Pneumatic M-4 Recirc System 120VAC, 73gpm | 2002-002 |
| Tank, 10300 gallon HDXLPE Bulk Tank. | 2009-055 |
| Tank, 8000 gal bulk tank w/ agitator and vent dryer | 1999-063 |
| Transfer Pump Skid, Duplex Yamada Air pumps,  2" Yamada NDP-50BPS-T1 (PP with Santoprene diaphragms and TFE elastomers) PIPING 304SS with timer, solenoid on air | 2007-075 |

The aggregate purchase price is $12,000,000 consisting of (a) a cash sum of  (i)$5,000,000 (minus the amount of the ad valorem taxes); plus (ii) the amount of the ad valorem taxes; plus (iii) the amount of the cure payments on the Assigned Executory Agreements to be paid to Seller at Closing and (b) preferred shares in the capital of Buyer with a maximum redemption price of $7,000,000, which preferred shares shall be registered in the name of Seller at Closing.

Within 90 days following the end of the second full fiscal year of Buyer after the Closing, and annually thereafter until fully redeemed, the preferred shares will be mandatorily redeemed by Buyer, in whole or in part to the extent of Available Free Cash Flow (as defined below) for the then most recently completed fiscal period of Buyer, so long as such redemption can be effectuated without breaching Buyer's banking covenants and applicable law.  "Available Free Cash Flow" means, with respect to any fiscal period of Buyer, 50% of Buyer's free cash flow (taking into account capital expenditures and working capital requirements) for the applicable period.  Any preferred shares that are not redeemed at the end of any fiscal year of Buyer according to the foregoing formula shall be eligible for redemption at the end of the following fiscal year to the extent of Available Free Cash Flow for such following fiscal year, provided that any preferred shares that have not be redeemed by the end of the seventh full fiscal year of Buyer following Closing shall be redeemed for $1.  The preferred shares will not be entitled to vote.

## Schedule 2.7(c) – Cure Amounts

| | |
|---|---|
| **DTE Petcoke LLC** | **$50,000.00** |
| **Liasion Technologies Inc. (EDI-Duro)** | **$7,919.33** |
| **All Other Agreements** | **$0.00** |

# Exhibit A

# to Purchase and Sale Agreement

## Bidding and Sales Procedures

# Exhibit B

## to Purchase and Sale Agreement

### Act of Sale

**Exhibit C**

**to Purchase and Sale Agreement**

**Bill of Sale**